**RED RIVER REFINING CO. v. SUN OIL CO.**

**PETROLEUM DERIVATIVES, INC., OF MAINE, v. SAME.**

Nos. 9337, 9339.

District Court, E. D. Pennsylvania.
July 29, 1939.

Harvey L. Lechner, Roy F. Steward, and Mitford C. Massie, all of Philadelphia, Pa., for plaintiffs.

Frank S. Busser and Geo. J. Harding, both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

These two suits are for infringement of three patents, all having to do with the production of lubricating oils from petroleum by distillation. They are Nos. 1,448,-709 to Schultze, 2,017,820 to Schultze, and 1,727,380 to Ryder. For convenience they will be discussed as though there was one suit and one plaintiff.

Of the claims in suit 27, 28, 32, 33, 34, 35, 36, 38, 40, 42, 43, 45, 46, 47, 48, and 49 of the '709 patent, 19, 20, 22, 23, and 25 of the '820 patent, and 13, 14, 15, 16, and 17 of the '380 patent are process claims. 13, 14, 15, 16, and 25 of the '709 patent are product claims for oils produced by the process of that patent.

### I. No. 1,448,709—Process Claims.

The first question is as to the validity of the process claims. Claim 45 of the '709 patent may be taken as typical. It is: "In the manufacture of lubricating oils, the process which comprises distilling a lubricant-containing mineral oil material at an absolute pressure not substantially exceeding 15 mm. of mercury and under non-oxidizing conditions."

With the understanding that a number of the process claims fix the upward limit of the vacuum or absolute pressure permitted at 25 mm. of mercury—a point which the plaintiff says is critical—it will not be necessary to extend the discussion very much beyond the question of the validity of the claim above quoted, since its infringement is admitted, and since all the process claims of all three patents describe the process as one in which a vacuum of at least 25 mm. absolute pressure, or less, is requisite.

The degree of vacuum is the essential element of the process; in fact, it is the only element upon which novelty or invention can seriously be claimed for the patent. In his brief the plaintiff has argued that "under non-oxidizing conditions" is another essential, if not equally important, element of the process, but that contention is quite inconsistent with the position which both counsel and expert for the plaintiff took at the time of the trial. See discussion at pages 960-971 of the notes of testimony.

Of the various common distillates of petroleum, lubricating oils are the highest boiling fractions and the last to pass over in a complete process of distillation. They may be taken off through a considerable

range of temperatures, and those distilled at the highest temperature will represent the heaviest fractions of the crude, and consequently show the highest degree of viscosity. High viscosity lubricating oils are a very important product commercially.

Because of the high temperatures required, certain difficulties exist in connection with the distillation of lubricating oils—and to some extent of kerosene, a lower boiling fraction—which result in the impairment of the quality and usefulness of the product. They are, in order of importance:

1. Cracking—or rather, excessive cracking, it being impossible to avoid all cracking. At high temperatures (beginning about 570 degrees F. and becoming marked around 620 to 630 degrees) certain chemical changes take place in the oil or oil vapor in the process of distillation, resulting in the formation of light, volatile, "cracked" products, the exact nature of which does not appear to have been definitely ascertained. Although gasoline may be obtained by cracking, it is not sought in the process and does not appear in any useful amounts in the oil distillates.

2. The formation of malodorous unstable products arising from the decomposition of various impurities, largely sulphur compounds, which may exist in the original crude in varying degrees. The art of today distinguishes these contaminants from the cracked products of the hydrocarbon itself and recognizes that they will be often formed long before cracking temperatures are reached.

3. Oxidation during distillation.

4. Entrainment, or the carrying over into the distillate with the vapor of minute particles of residual matter.

If these difficulties are not avoided the product will contain impurities. Some of the product claims of the first patent refer to "tarry matter"—a term having no scientific definition, and apparently not in very general use. The plaintiff's position is that it is used to describe generally dark colored impurities in the distillate arising from the cracked and decomposed products, the entrained residual matter, and the oxidation.

The effect of the presence in any appreciable amount of these various substances in lubricating oil is to make it unstable and to cause it to deteriorate both in appearance and quality so as to render it practically unsalable, though perhaps not entirely useless. This instability is recognized by a progressive change of color from light to dark, referred to as color instability. Color stability is, from the commercial standpoint, probably one of the most important qualities of a lubricating oil. A light clear shade is also important, but principally as an additional selling point.

To remove the impurities in question from the distillate and give it color stability, the prior art universally resorted to chemical refining, which usually consisted of several steps, including treatment with sulphuric acid, washing, and filtration through fullers' earth. Chemical refining had several disadvantages. It added materially to the cost of production; it caused losses of material quantities of useful oil from the distillate; and, according to the plaintiff's expert, it impaired the quality of the final product by giving it a tendency to emulsify and by removing certain constituents whose presence would tend to prevent oxidation and would give superior strength to the oil film in use.

It may be stated, parenthetically, that the patents do not exclude or intend to dispense with preliminary alkali treatment of the crude before distillation, now widely used in the industry. In fact, the Schultze '820 patent claims this treatment as one of the elements of its process.

Stated in the most general terms, all three of the patents have for their object the production of stable lubricating oils, of high viscosity ('380 patent), by straight distillation, without the necessity for any chemical finishing process. The '709 patent is primarily directed to preventing cracking, oxidation and entrainment during distillation, by carrying on the distilling process under an absolute pressure of 25 mm. or less, in an airtight still, thus permitting vaporization at lower than ordinary temperatures. It does not attempt to deal with the decomposition products of the impurities in the original crude, which will carry over into the distillate and, under the '709 process, can only be eliminated by a re-run.

The '820 patent includes the elimination of the malodorous decomposition products and contemplates the use of the poorer grades of crude as charging stock. Its process is that of the '709 patent, plus initial treatment of the crude with caustic

soda and an intermediate condensation by which the impurities in question, which are higher-boiling than the lubricating oil components, are carried off before final condensation.

The '380 patent, like the '709, is chiefly aimed at the prevention of cracking, the object being to use higher temperatures without cracking, in order to distill the heavier fractions and obtain final products of higher viscosity. Since cracking is a matter of time as well as temperature, this patent, by spreading the crude thinly over the heat surface, vaporizes it in a much shorter time and so permits higher temperatures to be used. Otherwise it incorporates the process of the '709 patent.

In spite of the great amount of testimony taken, the issue of validity of the process claims presents a single, rather narrow question. It is whether prescribing an absolute pressure of not more than 25 mm. (15 mm. in claim 45) is novel and involves invention.

The art for 50 or 60 years had been familiar with vacuum distillation of petroleum. It recognized that what older publications called "destructive distillation" produced undesirable substances in the final product which impaired its quality. It was fully understood and disclosed that the higher the vacuum, the lower the boiling point could be kept and the less destructive distillation there would be and the better the result. Such expressions as "nearly complete vacuum," "partial or perfect vacuum," "nearly perfect vacuum," "the pressure is kept as low as possible," "the maximum possible vacuum," "as high a degree of vacuum as it is possible to maintain," "a vacuum as perfect as possible," "the vacuum should be as high as possible," appear in a number of prior patents.

The Tweddle patent, No. 72,126, and the von Groeling, No. 1,327,184, fairly epitomize the state of the entire art and show what it knew from a very early date (1867) up to the date of the patent in suit.

It is not necessary to discuss either of these patents in great detail. It is quite true that Tweddle was principally concerned with distilling illuminating oil (kerosene) rather than lubricating oil, that he used steam with his vacuum (it is a matter of argument whether or not the '709 patent forbids steam), and that in his day the very high vacuum of the plaintiff's patent was not commercially obtainable; but when all this is said, Tweddle did disclose distillation of petroleum under what he called a "complete" vacuum with the express object of obviating the necessity of refining or treating the oil with acids, alkalis, etc., to remove the "disagreeable odor" and "bad color" which, he says, is found in "unrefined, firedistilled oil." Von Groeling's patent is an apparatus patent, but it discloses practically everything that the plaintiff's patent contains—including the avoidance of the cracking or breaking up of the distillate, and the production of oils free of tarry substances and sharply differentiated (narrow cut)—except that he does not precisely define the vacuum in terms of absolute pressure, but states that he usually filters his product, the assumption being that filtration through fullers' earth is, in a sense, a chemical treatment. By von Groeling's time it was quite possible to obtain vacuums of less than 25 mm. absolute pressure in commercial installations, and if his directions were followed, the von Groeling apparatus would necessarily be operated under as high a vacuum as indicated in the processes of the plaintiff's patents.

On the other side of the picture of the prior art is the fact that, prior to the plaintiff's disclosures, there was no commercial distillation of lubricating oils carried on anywhere without the final stage of chemical refining. The suggestions of the prior art that this step could be dispensed with apparently made little impression upon practical operators. At any rate, they were not taken seriously enough for anyone to think it worth while to install a plant which would operate under the extremely high vacuums specified by Schultze. There is no proof that any commercial plant was operated under a vacuum approaching very near to the 25 mm. of absolute pressure specified by the plaintiff's patent. The Steinschneider process is described in publications in evidence as being carried on under a vacuum ranging from 40 or 50 mm. to 70 or 80 mm. mercury absolute. This, I believe, is about the closest. In fact, none of the patents themselves specify any particular degree of vacuum as measured by definite standards.

So I think it may be fairly said that the essence of the plaintiff's patent is contained in the disclosure that, when the "highest possible vacuum" of the prior art is higher than a certain fixed point and higher than any used in commercial practice, a new, though not unpredicted, result

of genuine commercial value can be obtained.

■ Whether or not this be called a discovery is not important. The law is plain that the discovery that an old process possesses an unsuspected advantage or accomplishes an unexpected result does not entitle one who points out that fact to a patent. The process must be new. Here the case for novelty and patentability in the process is necessarily rested upon two contentions: First, that the "highest practicable" vacuum of the prior art meant a vacuum considerably lower than the vacuum of the patent, being limited by mechanical difficulties in obtaining such pressures in large scale operating plants, to pressures of, say, not less than 40 mm. absolute; and, second, that the element of the combination, "under non-oxidizing conditions," imported something novel into the process.

[2] In spite of the fact that commercial practice stopped short of carrying out the instructions of the prior art patents to their full limits, the disclosure was plain and unmistakable, and I do not see how one can ignore it merely because the industry generally, probably because of the large cost involved, saw fit not to use it. "Invention will not be inferred from the mere fact that on account of danger or economic reasons there was delay in resorting to a tool of the industry." Standard Oil Co. v. Globe Oil, etc., Co., 7 Cir., 82 F.2d 488, 493. It might be argued that "as high a vacuum as possible" must be read as meaning a vacuum not higher than obtainable in plants of commercial size, and that argument would be applicable to a number of the earlier patents; but, by the beginning of this century, vacuums as high as those specified by the patent were entirely practical and obtainable (though, of course, at much greater cost) commercially. So that when von Groeling refers to as high a vacuum as possible, he is disclosing vacuums as high as anything which the plaintiff's patents make use of.

Nor can it be said that the point of 25 mm. absolute pressure is critical in the sense that, when it is reached, chemical reactions or physical changes take place which produce entirely new and unpredictable results in the product. It is true that after reaching a certain point (which may be 25 mm. absolute) cracking and decomposition falls sufficiently low to obviate the necessity for chemical refining of the product, but these reactions were being diminished by lowered pressures long before the point in question was reached. The prior art had always taught that the higher the vacuum the better the results. It is purely a question of degree. Exactly the same thing goes on before the patentee's specified pressure is reached as after.

I therefore must conclude that the specification of any definite degree of pressure imports nothing new into the claim and that the elements which include distilling at an absolute pressure of 15 (or 25) mm. are fully anticipated by the processes of the prior art.

The contention that "under non-oxidizing conditions" is new and contributes to patentability of the invention seems to be entirely without merit. The use of a still as nearly airtight as it is possible to make it is inherent in every kind of operation in which the maintenance of a high vacuum is important. It is hardly necessary to refer to the prior art, but, in addition to the patents calling for "a nearly complete" or "perfect" vacuum, Wahl, No. 54,629, says that the still should be constructed so that "no air can possibly enter," and Grant and Mason, Nos. 339,545 and –546, say that "there is no air admitted into the retort" in order to "prevent oxidation." The plaintiff's suggestion that nowhere in the prior art was there taught or disclosed the elimination of minute leakages, that all that was meant was a substantially airtight still, and that the idea of absolute exclusion of air by welding the still (which, incidentally, does not appear in the claims or specification of his patent), is novel and inventive, is too fine-spun to be accepted.

■ The conclusion, therefore, is that claim 45, as well as all the other process claims of the '709 patent, are invalid for want of novelty and invention.

## II. No. 1,448,709—Product Claims.

■ A typical product claim is claim 13, which is as follows: "As a new article of manufacture, a straight overhead lubricating oil distillate derived from a napthenic base oil and having a viscosity exceeding 100 seconds Saybolt universal (at 212 degrees F.), said distillate being substantially free of tarry matter." All these claims are combinations of the same three elements—first, a high degree of viscosity; second, substantial freedom from tarry matter; and, third, a product

which can be described as a straight overhead distillate.

The last element obviously imports into the claim, as part of the description of the product, the identification of the process by which it has been made. A straight, overhead distillate clearly indicates an oil which has not been either chemically refined or blended with undistilled cylinder stocks. Many descriptive terms used in product claims necessarily imply a reference to processes, and thus it sometimes occurs that what appears to be a product claim is in reality for a process. While these claims may be dealt with as general product claims, disclosures of prior processes which anticipate the process incorporated into them and which will produce identical products, necessarily anticipate even though they do not specifically describe or claim the products.

Whether the term "straight overhead distillate" is confined to a distillate produced by the process of the patent, namely vacuum distillation under lower than 25 mm. absolute pressure, or whether it is intended to cover all types of oil produced by distillation without chemical finishing, in either case, having in mind what has been said about the process claims, these product claims are anticipated by the disclosures of the prior art. As has been pointed out, several of the prior art patents describe processes for producing oil without chemical finishing. In all of them, necessarily, and in some cases expressly, the characteristics of the products are fully disclosed. Tweddle, 72,126, definitely states that his process obviates the necessity of refining the oil and produces an article superior in quality to the common fire-distilled defined oils, and it appears that what he means is oil without any disagreeable odor or bad color, and without the impurities which chemical refining was intended to remove. Ewing, 56,852, is to the same general effect. Von Groeling, 1,327,184, is more explicit and defines oils of the "best possible qualities as regards * * * color, viscosity and smell," and also states that he avoids "formation of tarry substances (asphaltum and coke or carbon) in the later products." He also directs that "the vacuum should be as high as possible." It is unnecessary to determine whether or not von Groeling is a complete anticipation of the product claims. The fact that he states that the products "are usually" filtered with fullers'

earth may take the oils out of the class of straight overhead distillates, though that is doubtful, and he may have in mind a more restricted class of substances when he refers to tarry matter than the plaintiff's patent. However, whatever definition be given to tarry substances, the art as a whole did disclose processes intended to obtain oils of high viscosity, free of all manner of impurities, without chemical finishing. I agree that in practice such oils had never been actually produced as "straight overhead distillates," just as, in practice, the process of the patent, which eliminated chemical refining, had never been commercially carried out. But anticipation by disclosure invalidates subsequent patents just as fully as anticipation in practice, and there is little doubt that both the process and the products of patent '709 were disclosed in prior publications and patents.

Claim 25 is a product claim differing somewhat from those just discussed. Assuming that it is entitled to be read with the specification and that the oil claimed is a straight overhead distillate produced by the process of the patent, it nevertheless does not claim a product free of tarry matter, but rather one characterized by a narrow viscosity range. The viscosity range is fixed between certain definite points and is determined upon redistillation. There may be a peculiar commercial advantage in a "narrow cut" oil, that is, one having a narrow viscosity range, but it seems to me that it is merely another way of saying that the oil has a comparatively small amount of lighter volatile components in it.

There was a dispute as to the interpretation of this claim, but, accepting the plaintiff's view that the range is determined by taking cuts of the first 10% and the last 10% of the distillate so that the defendant would infringe, it is only necessary to say that the defendant set up at its plant an apparatus in substantial conformity with that disclosed by the Atwood patent of 1880, and there, operating under a vacuum of not less than 50 mm. absolute pressure, produced oils fully meeting all the requirements of claim 25, so far as the viscosity range is concerned, and also practically identical in this respect with the oils which the defendant produces in its commercial plant. Obviously this claim therefore is either anticipated by the

product disclosed by the Atwood patent or, if not, then the defendant does not infringe.

### III. Nos. 2,017,820 and 1,727,380.

Certain general observations may be made which apply equally to the '820 and the '380 patent. While apparatus is disclosed by each, the claims in suit are process claims. In none of them are there any elements which do not appear in the various processes of the prior art with the exception of the degree of vacuum under which the process is to be carried on as specified in the '709 patent. While it is probably true that no single prior art process involved a complete anticipation of the apparatus of either of these two patents, it is also true that in the features in which the apparatus of the defendant differs from the prior art, even if these features are covered by the plaintiff's claims, there is practically nothing of real substance.

If distillation under vacuums of less than 25 mm. pressure is not novel or patentable (as has been decided), I find no invention in combining it with the other steps of the old processes as claimed in the '820 and '380 patents, though pretreatment with caustic soda be included, as in the process of the '820 patent.

'709 is, of course, prior art against both of them. The reflux condenser of '820 was common enough, and pretreatment of the charging stock with caustic soda was practiced by the Texas Company as shown by the testimony taken at Port Arthur. All crudes contain impurities. The plaintiff claims the use of original charging stocks high in these undesirable qualities as a part of the process, but, here again, it is largely a question of degree, and, obviously, if there is nothing inventive in the steps claimed, patentability cannot be found in the selection of the poorer grades of petroleum to which to apply the process.

The idea of separating the malodorous decomposition products from the condensate by partial condensation of the vapors at a temperature low enough to condense the heavier fractions but not low enough to affect the low boiling media in which the undesirable products are found is fully described in the Atwood patent, No. 266,151 of 1880. It also appears in other prior art processes, down to the Steinschneider British patent, 8758 of 1913. This step of the '820 process, though broadly stated in the claims, does, if closely limited by the specification, and the apparatus disclosed thereby, show some slight departure from the prior art (notably in the large diameter of the lines for the passage of the vapor in two directions), but I do not think that the claims can be sustained upon these features alone, or, if so sustained, that they would cover the defendant's operation, and it is unnecessary to discuss them in detail.

The plaintiff concedes that, with the '709 patent in the prior art, none of the major elements of the '820 process are novel. His case for invention is, broadly, that the threefold combination consisting of, less than 25 mm. pressure, intermediate reflux condensation to eliminate impurities, and pretreatment with caustic soda, is patentable, because it produces a new result, namely the production, from inferior crudes, of high grade oils which do not require chemical refining in order to be marketable.

But, so far as obtaining stable and commercially usable oils without chemical refining is concerned, the "new result" (the elimination of chemical refining) claimed by the plaintiff was not really new with the '820 patent, but that had been disclosed by the '709 patent—a patent clearly invalid in view of the prior art disclosures —as well as in earlier patents. Thus, in '820, what we have is merely the addition of certain steps well known in the art, to meet conditions arising from the use of low grade petroleum. Given the knowledge that the highest possible vacuum (which, of course, includes less than 25 mm. pressure) will largely eliminate cracking, it requires no invention to add to this process the intermediate condensation step and the pretreatment with caustic soda of the prior art, in order to get rid of impurities and their decomposition products when the charging stock was bad enough to require it. Whatever advantageous result may have been obtained in the character of the oil produced, it was not new in the light of the prior disclosures.

This would seem to follow, whether the '709 patent contained a real invention or not. Even a patentable process cannot have its monopoly indefinitely extended by combining it with other well known steps in order to apply it to different kinds of materials.

The most important feature of the '380 patent is rapid vaporization of the oil obtained by flowing it in a thin stream having a free surface over the heat medium, thus reducing the time of distillation and further eliminating cracking in the distillation of the higher boiling, heavier fractions. The result claimed is a more viscous product.

Exactly the same considerations apply to this patent as have been mentioned with regard to '820. It also requires a vacuum of less than 25 mm. pressure. The Tweddle patent, 72,126, of 1867, flows the oil in a thin film or layer over a series of heater pipes and successive stills are subjected to progressively higher degrees of heat. The Burleson and Prutzman patent No. 1,180,237 of 1916, also shows these features.

My conclusions are:

1. Claims which call for distillation of petroleum under an absolute pressure not substantially exceeding 25 mm. mercury are anticipated by disclosures of the prior art of processes specifying "the highest possible vacuum" or "highest practicable vacuum."

2. The fact that commercial practice prior to the time of the '709 patent did not include operations at vacuums less than 25 mm. pressures does not, in view of the disclosures impart invention to the patents specifying that particular degree of vacuum.

3. All the claims in suit of the '709 patent are invalid as anticipated by the disclosures of the prior art.

4. All claims in suit of the '820 patent are invalid as wanting invention.

5. All claims in suit of the '380 patent are invalid as wanting invention.

6. The following claims would be infringed by the defendant if not invalid: '709 patent, claims 27, 45 and 46; '820 patent, claims 19, 22 and 25; '380 patent, claims 16 and 17.

In view of the findings of invalidity of all the claims in suit, it is not necessary to discuss the question of infringement, and I do not make findings upon that point except in regard to such claims as to which infringement was admitted by the defendant.

The statement of fact contained in the foregoing opinion may be taken as special findings of fact.

Judgment for the defendant.