GENERAL ELECTRIC CO. v. JEWEL INCANDESCENT LAMP CO. et al.

No. 5482.

District Court, D. New Jersey.

Dec. 9, 1942.

Howson & Howson, of New York City, (Alexander C. Neave, of New York City, of counsel), for plaintiff.

Kessler & Kessler, of Newark, N.J. (Samuel E. Darby, Jr., of New York City, of counsel), for defendants.

SMITH, District Judge.

This is a suit for the infringement of Patent No. 1,687,510, issued on the application of Marvin Pipkin, who, prior to the issuance thereof, assigned all right, title and interest therein to the plaintiff. The patent covers an article of manufacture therein identified as an "Electric Lamp Bulb". This suit is directed to a similar article of which the defendant Jewel Incandescent Lamp Company is the manufacturer, and the defendant Nulite Electric Company is the distributor. The defendants deny infringement and challenge the validity of the patent.

The invention of the patent relates to a frosted glass bulb of the type in common use in incandescent lamps, but is directed particularly to an improvement therein, to wit, an interior mat surface "characterized by the presence of rounded as distinguished from sharp angular crevices." The advantages of the frosted interior, as well as the disadvantages of the frosted exterior, had been generally recognized prior to the present invention and, therefore, do not require recitation here; but, it had also been recognized that the frosted interior, although otherwise advantageous, impaired the strength of the bulb. The primary object of the invention was to overcome this defect without destroying the diffusive qualities of the mat surface. The improvement accomplished this desired result.

The determination of the ultimate issues requires a determination of the scope of the allowed claims, which, in the opinion of the Court, is narrow. The invention is defined in claim 1, which is typical, as follows: *"A glass electric lamp bulb having its interior surface frosted by etching* so that the maximum brightness of an ordinary incandescent lamp comprising such a bulb will be less than twenty-five per cent of that of said lamp with a clear bulb, *said interior bulb surface being characterized by the presence of rounded as distinguished from sharp angular crevices* to such an extent that the strength to resist breakage by impact is greater than twenty per cent of that of a clear bulb." When the allowed claims are read and interpreted in the light of the rejected claims and the prior art, both of which are hereinafter discussed, it is evident that the invention of the patent, measured by the claims, is restricted to a glass bulb possessing an interior mat surface "characterized by the presence of rounded as distinguished from sharp angular crevices." There is no other feature, except those which are exclusively functional, to which the patentee lays claim.

It is conceded that the described improvement, to wit, the interior mat surface "characterized by the presence of rounded as distinguished from sharp angular crevices", is the unavoidable result of a chemical etching process which had been in common use in the glass industry for many years prior to the present invention. This result, like many chemical phenomena, is so inherent in the process that it is difficult, if not impossible, to alienate the defined surface from the process which produces it. The claims of the patent in suit, as well as the disclosures of the prior art references, must be read in the light of this fact if their full import is to be appreciated.

The claims in suit, although directed to an improvement in an article of manufacture, to wit, the interior mat surface, are so drafted as to necessarily embrace the chemical process by which the defined result is produced. The process and the result are so interrelated that they are inseparable. It follows that the claims, although they appear to be directed to a structure, are anticipated by earlier disclosures of the process incorporated into them either by implication or otherwise. Red River Refining Co. v. Sun Oil Co., D. C., 29 F.Supp. 636, affirmed 3 Cir., 112 F.2d 575. The language of Judge Kirkpatrick in the cited case is particularly applicable here. It is therein stated, at page 641 of 29 F.Supp., that: "Many descriptive terms used in

product claims necessarily imply a reference to processes, and thus it sometimes occurs that what appears to be a product claim is in reality for a process. While these claims may be dealt with as general product claims, disclosures of prior processes which anticipate the process incorporated into them and which will produce identical products, necessarily anticipate even though they do not specifically describe or claim the products." There is in each of the claims in suit an explicit reference to the etching process as the only means by which the result may be produced. The purported invention is not, as the plaintiff contends, an article of manufacture "however produced", but an improvement therein resulting only from the application of the identified process, and no other. Cf. Smith v. Goodyear Dental Vulcanite Co., 93 U.S. 486, 493, 23 L.Ed. 952.

It clearly appears from the prior art publications that long before the present invention extensive studies had been made of the chemical etching process which had been in common use in the glass industry. The results of these studies had been widely published, and there was available to Pipkin, at the time of his invention, a fund of pertinent knowledge. It had been discovered and published that the primary treatment of glass with etching solutions of well known formulae produced a mat surface characterized by the presence of microscopic hexagonal or octagonal depressions and acute angular interstices. It had also been discovered and published that the secondary treatment of such a mat surface with dilute hydrofluoric acid reduced the acute angles and produced concave interstices, thereby imparting a smooth finish. The process of multiple etching, recommended by Pipkin in his specifications, as well as the results of its application, defined by Pipkin in his claims, had been studied and publicly revealed as early as 1887, if not earlier. These conclusions are amply supported by the relevant prior art publications [1] relied upon by the defendant. Those which are apposite are worthy of special consideration.

Reinitzer, Contributions to the Knowledge of Glass Etching, Die Glashutte, published in 1887, presents such an exhaustive study of the subject matter that it is difficult to select any part of the text as particularly applicable without detracting from the full significance of its disclosures. This is equally true of Tillotson, On the Relation Between the Physical Properties and Chemical Composition of Glass Etch Figures, The Journal of Industrial and Engineering Chemistry, published in 1917. These papers disclose the multiple etching process recommended by Pipkin in his specifications and describe, in language almost identical with that of his claims, the mat surface claimed by him as the essential feature of his invention, the unavoidable result of the process. It seems evident, if these disclosures are accorded their comprehensive significance, that there is no patentable feature which distinguishes the mat surface defined by Pipkin from that described by both Reinitzer and Tillotson.

It is particularly significant that Reinitzer, in 1887, and Tillotson, in 1917, not only revealed that the multiple etching process imparted to the glass a smooth mat surface, but recognized that such a surface possessed definite diffusive qualities of utility, a functional characteristic embodied in each of the claims in suit. It is of further significance that each of them taught that the physical characteristics of the mat surface, and consequently the diffusive qualities inherent therein, were dependent upon and controllable in the successive steps in the process.

There are but three of the prior art patents relied upon by the defendants which are particularly relevant: The Kennedy Patent (No. 733,972), the Wood Patent (No. 1,240,398) and the Correll Patent (British—No. 166,133). The Webb Patent (No. 122,696) and the Archer Patent (No. 152,059) are relevant only because of their disclosure that the etching of the interior surface of hollow glassware had been practiced as early as 1871. The Harrison Patent (No.1,299,936) is irrelevant because its disclosures are too remote.

---

[1] Reinitzer, Contributions to the Knowledge of Glass Etching, Die Glashutte, published in 1887; Tillotson, On the Relation Between the Physical Properties and Chemical Composition of Glass Etch Figures, The Journal of Industrial and Engineering Chemistry, published in 1917; The Etching of Hollow Glass, Sprechsaal, No. 49, published in 1907; Sprechsaal, Nos. 21 and 22, published in 1906; Present Day Manufacture Working Up an Ornamentation of Finer Hollow Glass (Hohlbaum, 1910); Sprechsaal, No. 48.

The patent to Kennedy, granted on July 21, 1903, was directed to a method of frosting the interior of a glass bulb of the type then in common use in incandescent lamps. The object of the invention, in the language of the inventor, was "to produce on the inner surface of the bulb a frosted appearance, which may cover the whole of the said inner surface or only a part thereof." The patent instructed that the inner surface of the bulb be treated with an etching solution and thereafter rinsed with water. The instructions, although they did not specifically contemplate the multiple etching process, did not preclude its application. The glass technologist, desirous of imparting to the interior of a bulb the mat surface hereinabove described, could, following the method of Kennedy, avail himself of the multiple etching process then in common use. This practice of the method would produce, as the unavoidable result of the multiple etching process, the mat surface "characterized by the presence of rounded as distinguished from sharp angular crevices," to which Pipkin asserts claim. Any other construction, and especially the one here urged by the plaintiff, would deny the Kennedy patent the full import of its disclosures.

It is unnecessary, however, to amplify the disclosures of Kennedy by incorporating therein the earlier teachings of others. It was convincingly demonstrated at the trial of this cause that a bulb frosted according to the method of Kennedy was comparable in strength to the bulb defined by Pipkin in his claims. It is apparent, unless the earlier teachings are totally disregarded, if the method as demonstrated is followed, that the mat surface of the respective bulbs are identical, whether frosted according to the teachings of Kennedy or the recommendations of Pipkin. If the method of Kennedy is followed, as it was in the demonstration, the unavoidable result is the bulb defined by Pipkin in his claims. The success of the demonstration must be attributed to the use of hot water in the rinsing operation. It seems obvious that the rinsing, as thus carried out, is equivalent to washing with a hot solution of dilute hydrofluoric acid; the etching solution remaining on the etched surface becomes the active ingredient of the rinse.

The plaintiff, in an effort to avoid anticipation, argues that the demonstration was a departure from the method of Kennedy in that the rinsing of the mat surface was carried out in hot water and not in cold water. It must be conceded that Kennedy made no recommendation as to the temperature of the rinsing water, but it appears from the prior art publications that rinsing with hot water, rather than cold water, had been common practice. Reinitzer, at page 74, acknowledged, without asserting any claim to originality, the importance of temperature to the etching process, especially where a smooth finish was desired. The art under discussion is so akin to the field of chemistry that it is inconceivable that glass technologists, prior to Kennedy, had not recognized the influence of temperature in the etching process.

The patent to Wood, granted Sept. 18, 1917, was directed to a "Method of Making Light Diffusing Screens", and defines the invention in claim 2 thereof, which is typical, as follows: "The method of making a light diffusing screen, which consists in forming in a glass surface by mechanical abrasion a multiplicity of irregular pits separated by a plain surface relatively wide as compared with the depth of the pits, *and then smoothing it and enlarging these pits into contiguous concave depressions by the application of acid to the pitted surface of said glass,* and then removing the acid therefrom, each of said depressions forming the surface of a concave lens." This patent, although directed to a method, describes in detail a smooth mat surface, equivalent to that defined by Pipkin, resulting from its application. There is no critical distinction, unless the descriptive language used can be so regarded, between this disclosure and that of the claims in suit. The difference in the means employed, either chemical or mechanical, in producing the initial etch, is not a critical difference, and no point is here made of it.

It is apparent from the specifications of the patent to Wood, that he, as had the others who preceded him, recognized that the smooth mat surface possessed diffusive qualities of utility. This he expressed in this language: "These microscopic lenses, which cover the surface, diffuse the light in a very perfect manner and transmit practically all of the light, the loss due to reflection from the steep sides of irregularly formed pits being absent in this case." It should be noted that this was an additional object which Pipkin hoped to accomplish by his invention, and, it may be assumed that in this regard he realized a better result. It cannot be disputed, however, that

Wood was fully appreciative of the diffusive qualities inherent in the physical characteristics of the structure.

The real significance of the Wood patent lies in the fact that the patentee not only defined the smooth mat surface, as well as the method of creating it, but clearly suggested its use in the bulbs of incandescent lamps. This suggestion, embodied in the specifications, follows: "Such a screen is also useful for rendering the bulbs of incandescent lamps diffusing without at the same time causing a very marked loss in the efficiency of the lamp, which results from frosting the bulbs in the usual manner." This disclosure, which the plaintiff urges is a casual statement of no importance, must be read in the light of the admitted facts that the advantages of frosting the interior of glass bulbs had been theretofore recognized and the method had been theretofore taught. The properties inherent in the mat surface defined by Pipkin are likewise, and for the same reason, inherent in the mat surface described by Wood. The fact that Wood may not have appreciated all of them does not minimize the effect of the disclosure.

The patent to Correll granted September 7, 1922, was directed to an improvement in "screens" used for the "reception of optically-projected images, pictures," etc. It is evident from the specifications that the inventor availed himself of the multiple etching process, hereinabove discussed, to impart to a glass screen a "satin finish" of desired diffusive quality. The specifications instructed that the surface "is produced by first heavily matteing with 'white acid', sandblasting or equivalent and *subsequently reducing or clearing such surface with hydrofluoric acid.*" The apparent object of the secondary treatment was to reduce the sharp angular crevices and thereby produce the "satin finish", an essential element of the invention. The mat surface, the unavoidable result of the multiple etching process recommended in the specifications, is identical with that defined in the claims in suit, although otherwise described.

 It is obvious that there was nothing new in either the interior mat surface defined by Pipkin in his claims, or the process identified therein as the method of producing it. The advance over the prior art, if any, was in reality nothing more than the application of the multiple etching process to another article of hollow glassware, the bulb of an incandescent lamp, a course plainly indicated by the teachings of the prior art. It is well established that the adaptation of an old process to a new use, clearly indicated by the prior art, is not invention. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 55 S.Ct. 449, 79 L.Ed. 997; Lovell Mfg. Co. v. Cary, 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307; Brown et al. v. Piper, 91 U.S. 37, 23 L.Ed. 200; Floridin Co. v. Attapulgus Clay Co., 3 Cir., 125 F.2d 669; Goodman et al. v. Paul E. Hawkinson Co., 9 Cir., 120 F.2d 167; Dorr Co., Inc. et al. v. Yabucoa Sugar Co., 1 Cir., 119 F.2d 521; Globe Oil & Refining Co. v. Sinclair Refining Co., 3 Cir., 103 F.2d 95; United States Rubber Co. v. Sidney Blumenthal & Co., 2 Cir., 98 F.2d 767; Celite Corp. v. Dicalite Co., 9 Cir., 96 F.2d 242, and other cases herein cited. The discovery that the multiple etching process possessed an unsuspected advantage and accomplished an unexpected result, without any exercise of the inventive faculty, was not a patentable discovery. Lovell. Mfg. Co. v. Cary, Floridin Co. v. Attapulgus Clay Co., Red River Refining Co. v. Sun Oil Co., all supra, and other cases herein cited. The incorporation of the mat surface into an article of hollow glassware, a use likewise plainly indicated by the prior art, was not invention; this, as in the case of the process, was nothing more than the adaptation of an old structure to a new use. St. Germain v. Brunswick, 135 U.S. 227, 10 S.Ct. 822, 34 L.Ed. 122; Heald v. Rice, 104 U.S. 737, 26 L.Ed. 910; Perfect Circle Co. v. Hastings Mfg. Co., 6 Cir., 88 F.2d 813; Grand Rapids Refrigerator Co. v. Stevens, 6 Cir., 27 F.2d 243; Novocol Chemical Mfg. Co. v. Powers & Anderson Dental Co., 4 Cir., 128 F.2d 904, and other cases cited in the succeeding paragraph.

 The claim to invention here rests upon the fact, fully accepted by the parties, that no one prior to Pipkin had perceived that the interior mat surface "characterized by the presence of rounded as distinguished from sharp angular crevices" increased the resistance of a frosted glass bulb to breakage. This fact neither enhances the claim to invention nor impairs the disclosures of the prior art. The discovery of this peculiar property, inherent in the physical characteristics of the mat surface, was not a patentable

"discovery" within the meaning of the statute; In re Lewis, 108 F.2d 248, 27 C.C.P.A., Patents, 801; In re Hoover, 102 F.2d 849, 26 C.C.P.A., Patents, 1138; In re Newton et al, 96 F.2d 291, 25 C.C.P.A., Patents, 1106; In re Heap, 74 F.2d 948, 22 C.C.P.A., Patents, 950; General Electric Co. v. De Forest Radio Co. et al., 3 Cir., 28 F.2d 641; and, the adaptation of the mat surface to a new use to which it was readily adaptable by reason of this peculiar property was not a patentable "invention" within the meaning of the statute. Ansonia Brass Co. v. Electrical Supply Co., 144 U.S. 11, 12 S.Ct. 601, 36 L.Ed. 327; Bingham Pump Co. v. Edwards, 9 Cir., 118 F.2d 338; Krupp Nirosta Co. et al. v. Coe, 68 App.D.C. 323, 96 F.2d 1013; Goldman v. Polan et al., 4 Cir., 93 F.2d 797. That those who preceded Pipkin neither appreciated all of the properties inherent in the structure, nor perceived all the uses to which the structure was accommodable, does not minimize the effect of their disclosures. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610; Roberts v. Ryer, 91 U.S. 150, 23 L.Ed. 267; Lovell Mfg. Co. v. Cary, supra; Stow v. Chicago, 104 U.S. 547, 26 L.Ed. 816; E. Edelmann & Co. v. Auto Parts Co., 7 Cir., 127 F.2d 897; Patents, Inc. v. Gillette Safety Razor Co., 3 Cir., 115 F.2d 484; Nichols v. Minnesota Mining & Mfg. Co., 4 Cir., 109 F.2d 162; Enterprise Mfg. Co. v. Shakespeare Co. et al. 6 Cir., 106 F.2d 800; Floridin Co. v. Attapulgus Clay Co., Goodman et al. v. Paul E. Hawkinson Co., Bingham Pump Co. v. Edwards, all supra. See Radio Corporation of America et al. v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 14, 54 S.Ct. 752, 78 L.Ed. 1453.

The facts in the case of Ansonia Brass Co. v. Electrical Supply Co., supra, seem to be strikingly similar to those of the instant case. In that case, as here, the patent, which covered an insulator, was directed to a peculiar property of the structure, incombustibility, which theretofore had not been recognized. The Court, at page 17, of 144 U.S., at page 604 of 12 S.Ct., 36 L.Ed. 327, comparing the patent there in suit with a patent of the prior art, stated, "It is true that the insulator used by Holmes was not intended to be, and perhaps was not known to be, incombustible, since this feature of its incombustibility added nothing to its value for protecting a burglar-alarm wire, which carries a current of comparatively low tension; but, as already observed, the testimony indicates that the insulator employed by him was in fact nearly, if not quite, as incombustible as that made by the plaintiff under the Cowles patent. If this be so, and the two insulators are practically the same in their method of construction, it is clear that Cowles *has no right to claim the feature of incombustibility as his invention,* since nothing is better settled in this court than that the application of an old process to a new and analogous purpose does not involve invention, even if the new result had not before been contemplated." The principle there enunciated is particularly applicable here.

It may be generally conceded that the adaptation of either a process or a structure to a new use in a remote industrial field may rise to the dignity of invention if an original and useful result, not theretofore conceived, is accomplished. The contribution of Pipkin, however, does not meet these standards. The chemical etching process had been in common use in the glass industry for many years and the results of its application had been well known. The glass technologist confronted by the problem, as was Pipkin, and having discovered the cause of the defect, as did Pipkin, had but to draw upon the fund of available knowledge for his remedy. This required nothing more than the expected skill of the art. Detroit Gasket & Mfg. Co. v. Victor Mfg. & Gasket Co., 7 Cir., 114 F.2d 868. The case of Gilbert Spruance Co. v. Ellis-Foster Co., 3 Cir., 114 F.2d 771, 773, upon which the plaintiff relies, is easily distinguishable from the instant case. There the inventor demonstrated inventive genius in that "he seized upon a thing which was available to all but which had been grasped by none, and was able to fit it into a new place, *to create an original and useful result.*" The alleged invention of Pipkin does not meet the test therein prescribed.

The comment of Justice Bradley in the case of Atlantic Works v. Brady, 107 U.S. 192, 199, 2 S.Ct. 225, 231, 27 L.Ed. 438, seems to be particularly pertinent here. It follows:

"The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary

head-workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant to a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill is distinctly shown, is unjust in principle and injurious in its consequences.

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

■ It follows that the claims in suit are invalid because of anticipation by and lack of invention over the prior art.

The patent in suit originated in an application filed in the Patent Office on February 4, 1924. The claims advanced in the said application were directed to both "method"[2] and "manufacture."[3] The said claims were rejected on the patent to Wood, hereinabove discussed, and were thereupon cancelled. Thereafter, on August 24, 1925, similar claims, more comprehensive in language, were substituted; these claims were, likewise, rejected on the patent to Wood. It should be noted that the structural elements of the "manufacture" defined in the claims in suit are identical with the structural elements of the "manufacture" defined in each of the rejected claims. A second application, a continuation in part of the original application, was filed on June 29, 1925. The claims advanced in the latter application, and the amendments thereof, were similarly directed to both "method"[4] and "manufacture."[5] The seventeen claims directed to the manufacture, and asserted in the amended application of November 22, 1926, were rejected because of their failure, as stated by the Examiner, "to claim any invention pointing out, as they do, merely the result of the invention." The application was finally amended on April 17, 1928, at which time the claims which had been theretofore advanced were cancelled, and the claims embodied in the patent in suit were asserted. These claims, as hereinbefore stated, were directed to a manufacture.

■ There are three significant facts apparent from this brief review of the history of the patent: first, claims defining the structural elements of the manufacture were rejected because of anticipation by and lack of invention over the prior art;

[2] The method of treating glass lamp bulbs and similarly thin glass articles which consists in chemically etching a surface thereof and afterwards subjecting the etched surface to the action of a reagent having a solvent action on the material of said surface. (This claim is typical).

[3] A bulb for electric lamps and smaller articles having its inner surface covered with rounded etching pits or depressions. (This claim is typical).

[4] The method of inside frosting a bulb which consists in first chemically frosting the inside thereof by etching until the bulb has a distinctly whitish appearance and then subjecting the surface thus produced to a chemical etching medium

with the conditions of time, temperature and etching strength of the medium such that the etching effect is less powerful than that of the original frosting treatment. (This claim is typical).

[5] A glass bulb for electric lamps and similar devices which is inside frosted in such manner that the maximum brightness in candles per square centimeter of an ordinary incandescent lamp comprising such a bulb is less than thirty per cent of that of the same lamp with a clear glass bulb and the light absorption is less than three per cent of the light emitted by the light source, said bulb having a strength to resist breakage by impact greater than sixteen per cent of that of the clear bulb. (This claim is typical).

second, claims defining the functions of the structural elements were properly rejected for the obvious reason. that functions, as such, are not patentable; and third, the claims in suit, as finally framed, differed from those previously rejected only in their embodiment of both structural elements and functions.

▇▇▇ There was nothing which distinguished the mat surface defined by Pipkin from the mat surface described by those who preceded him, except the functions ascribed to it in the particular article of manufacture, to wit, diffusion of light and resistance to breakage. The novelty of the invention, if any, lay, not in the structural elements, but in their function. The critical observation of Justice Reed in the case of General Electric Co. v. Wabash Appliance Corp. et al., 304 U.S. 364, at page 371, 58 S.Ct. 899, at page 903, 82 L.Ed. 1402, is apposite: "But the vice of a functional claim exists not only when a claim is 'wholly' functional, if that is ever true, but also when the inventor is painstaking when he recites what has already been seen, and then uses conveniently functional language at the exact point of novelty." It is well established that the patentability of a claim directed to an article of manufacture must be found in the structural elements therein defined and not in the functions to which claim is asserted. Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868; B. B. Chemical Co. v. Cataract Chemical Co., 2 Cir., 122 F.2d 526; In re Fischer, 91 F.2d 219, 24 C.C.P.A., Patents, 7344; George K. Hale Mfg. Co. v. Hafleigh & Co. et al., 3 Cir., 52 F.2d 714; Heidbrink et al. v. McKesson, 6 Cir., 290 F. 665; Walker on Patents, Deller's Edition, page 795, § 168, et seq.

▇▇▇ If, as the plaintiff contends, the claims in suit are directed to an article of manufacture, "however produced", their disclosures are insufficient to meet the requirements of the statute, R.S. § 4888, 35 U.S.C.A. § 33. The statute requires the inventor to define his invention "in such full, clear, concise, and exact terms as to enable any person skilled in the .art or science to which it appertains, * * * to make, construct, compound, and use the same"; and, to "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." The reasons which underlie the statutory requirements are suc-

cinctly stated in the case of .General Electric Co. v. Wabash Appliance Corp. et al., supra, 304 U.S. at page 369, 58 S.Ct. at page 902, 82 L.Ed. 1402, as follows: "The limits of a patent must be known for the protection of the patentee, the encouragement of the inventive genius of others, and the assurance that the subject of the patent will be dedicated ultimately to the public. The statute seeks to guard against unreasonable advantages to the patentee and disadvantages to others arising from uncertainty as to their rights. The inventor must 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.'"

▇▇▇ The invention is defined in each of the claims in suit as follows: "A glass electric lamp bulb having its interior surface frosted by etching * * *, said interior bulb surface being characterized by the presence of rounded as distinguished from sharp angular crevices to such an extent that the strength to resist breakage by impact is greater than twenty per cent of that of a clear bulb." The absence of satisfactory objective criteria is apparent. The claims fail to fix the critical limits with the exactitude required by the statute. The term "extent", used, as it must be, to define measure or degree, is so vague that the critical limits can be determined only upon independent experiment. It follows that the claims in suit are indefinite and, therefore, void. General Electric Co. v. Wabash Appliance Corp. et al., supra; The Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 227; B. B. Chemical Co. v. Cataract Chemical Co., supra; Allen-Bradley Co. v. Erie Resistor Corp., 3 Cir., 104 F.2d 150, and cases therein cited. The pronouncement of the Court in the case of General Electric Co. v. Wabash Appliance Corp. et al., 304 U.S. at page 369, 58 S.Ct. 899, at page 902, 82 L.Ed. 1402, when paraphrased, fits the instant case. It was there said: "Patentees may reasonably anticipate that claimed inventions, improvements, and discoveries, turning on points so refined as the granular structure of products [here the configuration of a mat surface], require precise descriptions of the new characteristic for which protection is sought. In a limited field the variant must be clearly defined."

828

The indefiniteness of the claims in suit is apparent upon attempt to compare the accused structure with their teachings. Satisfactory comparison is impossible because of the lack of a precise definition of the invention. The testimony of Charles Douglas Spencer, a physicist called as a witness on behalf of the plaintiff, would seem to support this conclusion. The witness compared the accused structure, not with the teachings of the patent, but with a structure manufactured by the plaintiff. Such a comparison, however, even though the structures are identical, will not support a charge of infringement. An allegation of infringement can be sustained only by proof of encroachment upon the claims of the patent. S. S. Kresge Co. v. Davies, 8 Cir., 112 F.2d 708; Magnavox Co. v. Hart & Reno et al., 9 Cir., 73 F.2d 433; Grand Rapids Show-Case Co. v. Weber Show Case Co., 9 Cir., 38 F.2d 730.

It should be observed that the witness experienced little difficulty in making the comparison and in pointing out striking similarities in the compared structures. The reason for the successful comparison, however, was obvious; both structures had been etched by chemical etching processes which had been in common use long prior to Pipkin. Comparable results were inevitable. It is the conclusion of the Court, based upon careful examination of the photomicrographs received in evidence, that the mat surface of the accused structure, as well as the mat surface of the structure manufactured by the plaintiff, is substantially identical with the mat surface of the prior art. If this is the mat surface defined by Pipkin in his claims, there can be no infringement. Comolite Corporation v. Davidovicz et al., 2 Cir., 111 F.2d 121; Galion Iron Works & Mfg. Co. v. Beckwith Machinery Co., 3 Cir., 105 F.2d 941.

It is difficult here to assume validity for the purpose of passing on the question of infringement. Such an assumption can be predicated only upon the construction hereinbefore adopted by the Court, to wit, that the claims in suit, although directed to an improvement in an article of manufacture, the interior mat surface, are so drafted as to necessarily embrace the method under which the defined result is produced. This strict construction so narrows the claims as to negative infringement. There can be no infringement of the claims, as thus construed, unless the accused structure is produced under the method recommended in the specifications and embraced in the claims. Plummer v. Sargent, 120 U.S. 442, 7 S.Ct. 640, 30 L.Ed. 737. The accused structure is an electric lamp bulb, the interior surface of which is "characterized by the presence of rounded as distinguished from sharp angular crevices," but it is not manufactured under the method embraced in the claims. It is clear from the undisputed testimony that the accused structure was manufactured under the method of Kennedy, hereinabove discussed, and that the chemical etching process employed had been in common use prior to Pipkin. This conclusion, although not conceded by the defendants, seems to be inescapable. It follows that the resulting structure cannot infringe the claims in suit. Thompson v. Boisselier, 114 U.S. 1, 9, 5 S.Ct. 1042, 29 L.Ed. 76; Comolite Corporation v. Davidovicz et al., supra.

The validity of the claims in suit has been sustained by the Circuit Court of Appeals for the Sixth Circuit, in the case of General Electric Co. v. Save Sales Co. et al., 82 F.2d 100, and by the Circuit Court of Appeals for the Second Circuit, in the case of General Electric Co. v. Wabash Appliance Corp. et al., 2 Cir., 93 F.2d 671. These decisions, however, appear to be predicated upon narrow interpretations of the teachings of the prior art, with which this Court cannot agree. We doubt that the patent would survive if litigated in the Second Circuit today. This is indicated by the opinion of Judge Hand in the case of Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632, 636, in which he stated: "We cannot, moreover, ignore the fact that the Supreme Court, whose word is final, has for a decade or more shown an increasing disposition to raise the standard of originality necessary for a patent. In this we recognize 'a pronounced new doctrinal trend' which it is our 'duty, cautiously to be sure, to follow not to resist.'"

The Findings of Fact and Conclusions of Law required by Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, have been prepared and filed by the Court.