**DOLLAC CORPORATION, Plaintiff,**

v.

**MARGON CORPORATION, Defendant.**

Civ. No. 603–56.

United States District Court
Third District New Jersey.
July 11, 1958.

Kirschstein, Kirschstein & Ottinger, New York City, Harry B. Rook, Newark, N. J., Gugenheimer, Untermeyer & Marshall, New York City, of counsel, for plaintiff.

James & Franklin, New York City, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Steelman, Rafferty & Rowe, Newark, N. J., of counsel, for defendant.

WILLIAM F. SMITH, District Judge.

This is primarily and essentially a civil action under the patent laws, particularly Sections 281, 283 and 284, of Title 35 U.S.C.A., and the issues are those usual in litigation of this character. The plaintiff filed a complaint in which it charged the defendant with the infringement of Patent No. 2,753,660, of which the plaintiff, as the assignee of one Harry Brudney, is admittedly the owner. The defendant filed an answer and counterclaim; in the former it denied infringement and challenged the validity of the patent, and in the latter it introduced two new causes of action. The defendant, in the first count of the counterclaim, charged the plaintiff with the infringement of Patent No. 2,657,500, of which the defendant, as the assignee of one Hans W. Samolewitz, is admittedly the owner. The plaintiff filed a reply and counterclaim; in the former it denied infringement and challenged the validity of the patent, and in the latter it introduced two new causes of action. We shall first direct our attention to the causes of action which are predicated on the patent laws; the other causes of action will be considered separately.

When the plaintiff opened its case it frankly admitted that claims 1, 2 and 3 of its patent, No. 2,753,660, supra, were invalid, and consented to an appropriate adjudication on the issue raised by the defense of invalidity. Such an adjudication will be embodied in the final judgment. There remained for determination the issues raised by the charge of infringement made against the plaintiff by the defendant and the defenses thereto interposed by the plaintiff. These issues were narrowed by the defendant, which predicated its charge of infringement on claims 1 to 4, inclusive, and claim 20 of the patent in suit. These issues were tried by the Court.

### Patent In Suit

The patent in suit, No. 2,657,500, supra, covers an artificial eye, which may be mounted in the head of a doll. The invention is defined broadly in claims 3 and 4, which are typical. The former defines the invention as follows: "A finished doll eye intended for use in a light-

proof enclosed doll head, said eye having pupil, iris, and eyeball portions all made out of a single body of transparent material, said eyeball portion being coated white outside the iris portion, *said pupil and iris portions both being devoid of extraneous colorina material* and being unobstructed by any part of the eye in a direction axially of the pupil and iris portions, *said pupil portion having a smooth, flat, relatively non-reflective back surface which appears black, and said iris portion having a roughened or serrated back surface which reflects light of a color similar to the color of the transparent material.*" (Emphasis by the Court.) It will be observed that this definition, insofar as it relates to the iris portion, is sufficiently broad to cover any iris component, the rear surface of which is serrated or grooved.

The invention as defined in claim 4 is identical except for one element, to wit, the iris component. The language of claim 4, between line 63 of column 8 and line 3 of column 9, is identical with the language of claim 3. The iris component of claim 4 is further defined as follows: "said iris portion having a *frustro-conical back surface,* and the serrations on the back surface of the iris portion being *more closely spaced near the center or pupil portion than at the periphery of the iris portion* in order to provide a graduated tinting of the iris, with the iris darker near its periphery and lighter near the pupil." (Emphasis by the Court.) It will be observed that the invention of claim 4 is narrow in that it embodies, in addition to the other elements, a frustro-conical iris component of the type described; it must be interpreted as so limited.

We see no reason to quote at length claims 1 and 2 of the patent in suit. Claim 1 is the counterpart of claim 3, except that it is limited to the lens component as defined in claim 3, to wit, the iris and pupil portions. Claim 2 is a counterpart of claim 4, except that it is likewise limited to the lens component as defined in claim 4. We should note at this time that there was clearly no invention in the utilization, either as a separate unit or as an integrally molded unit, of the "eyeball portion" described in claims 3 and 4; it will be hereinafter seen that this element was admittedly old in the art. The introduction of the acetate plastics as a substitute for metal led to their use in the industry and the adoption of the integrally molded artificial eye. We see no reason to quote claim 20; it defines the same invention as claim 3.

The specification of the patent in suit, lines 27 to 42, inclusive, of claim 1, states: "A more particular object" of the invention "is to simplify the provision of the desired black pupil portion. I have discovered that a deep black pupil portion may be obtained without using black coloring at all. *Instead the pupil portion of the lens is made transparent, and the eye is employed with a doll head which is otherwise light-proof so that it has a dark interior. The back of the pupil portion is made non-reflective to incident light.* What is wanted is total absorption of light. In simple form the *pupil portion is made smooth and flat,* and exposes the black interior of the head. The elimination of the manual operation of applying black coloring to the pupil area is a significant factor in reducing the cost of manufacture of the eye." (Emphasis by the Court.) When the claims in suit are read in the light of the specification it is apparent that an essential element of the invention is a pupil component, the rear surface of which is smooth and flat, and, as a consequence, relatively non-reflective.

The specification of the patent in suit, line 43 of column 1 to line 9 of column 2, inclusive, states: "A further object is to simplify the coloring of the iris portion of the eye. I have found that a brown eye may be obtained by tinting the transparent material with brown; a blue eye by tinting it with blue; and a gray eye by letting the material remain clear or untinted. The back of the iris portion, unlike the back of the pupil portion, is roughened or *serrated* to provide it with facets which reflect incident

light. The resulting reflection of light makes the brown or blue tint visible despite the black interior of the doll head, and without requiring the use of extraneous coloring material on either the front or the back sides of the iris portion. I have further found the presence of a slight brown or blue tint in no way marks the deep black appearance of the pupil." (Emphasis by the Court.) When the claims in suit are read in the light of this specification it is clear that an essential element of the invention is a suitably tinted iris component the rear surface of which is serrated or grooved; this is true whether the rear surface is either conical, as disclosed by the prior art, or frustro-conical, as described in claims 2 and 4, and as disclosed by the prior art.

The specification of the patent in suit, line 30 to line 43 of column 2, inclusive, states: "Another object of the present invention is to provide the desired *gradation of color* between the pupil and the periphery of the iris without necessitating the use of printed color disks or other extraneous means. This is done by increasing the number of light reflecting facets per unit of area near the pupil compared to the periphery. Assuming serrations are employed, the spacing between the serrations is made much greater near the periphery than it is near the pupil. Inasmuch as the color of the iris depends upon the reflection of incident light, and the reflection is greater at the center, the color is lighter at the center and darker near the rim." (Emphasis by the Court.)

The descriptive language quoted in the foregoing paragraph is particularly significant when read together with and in the light of the explanation contained in the specification, line 71 of column 4 to line 5 of column 5, inclusive. It is therein stated: "Moreover, from inspection of Fig. 7, it will be seen *that because of the generally radial nature of the serrations they are more closely spaced near the pupil than near the periphery. There is accordingly a greater intensity to light reflection near the pupil than near the periphery.* In consequence the color of the iris portion is darker near the periphery, and this is desirable because it is a characteristic of the natural eye." (Emphasis by the Court.)

This we construe as a frank admission by the inventor that where radial serrations are employed they are "more closely spaced near the center or pupil portion than at the periphery" of the iris portion, a feature of the invention as defined in claims 2 and 4. We might add that it couldn't be otherwise. A pertinent example is found not only in Fig. 7 but also in Fig. 18 of the specification, described therein in lines 40 to 55, inclusive, of column 6. It is therein stated: "the straight line radial serrations shown in Fig. 18 may be employed on a frustro-conical iris portion as well as on a flat iris portion." It follows that " a greater intensity to light reflection near the pupil" results from either the radial serrations or the semi-helical serrations. This is admitted in the foregoing quoted explanation. (See also the testimony of the inventor, at pages 327 et seq., of the record.) This characteristic, claimed as one of the functions of the serrated surface defined in claims 3 and 4, is inherent in any serrated surface in which the serrations are radial or semi-helical; there will be a greater intensity of light reflection near the pupil than near the periphery of the iris component.

The invention as defined in claim 4 comprises the following elements: first, a hemispherical plastic shell, the forward and outward portion of which— surrounding the lens component—is coated white to simulate the eyeball; second, an annular component, of *suitably tinted plastic*, either blue or brown, the reverse surface of which is frustro-conical and either *radially or semi-helically* serrated from the periphery of the said component to the periphery of an inner annular component, to simulate the iris, the said serrations "being more closely spaced near the center or pupil portion than at the periphery of the iris portion"; and third, an inner annular component, the reverse surface of which is *smooth and flat* and

by reason thereof relatively non-reflective. Claim 3 differs only in that the description of the serrated surface is sufficiently broad to cover any type of serrated surface.

The elements are herein identified as separate and distinct elements, but it will be remembered that under the claims in suit they are described as "made out of a single body of transparent material." This, according to the specification of the patent, is not necessary; the hemispherical plastic shell and the lens component, which includes the iris and the pupil, may be separately molded. (See line 69 of column 6 to line 10 of column 7, inclusive.) It will also be remembered that the lens component is devoid of all extraneous coloring matter, such as paint, etc. It should be noted that the prior art discloses a lens element, the iris and pupil components, made of a single body of transparent material. (See Marcus Patent, No. 2,254,232, infra, and also Exhibits D–36 and D–38.)

It is admitted that the utilization of the hemispherical plastic shell, hereinabove described as the first element, was old in the art. It is further admitted that upon the introduction of acetate plastics as a substitute for metal, subsequent to 1940, the shells were made of such plastics. It follows that the claim to invention here asserted must necessarily rest on the utilization of an artificial eye of the lens element, hereinabove described as the second and third components of the structure.

These components as defined in claims 2 and 4, are: first, a simulated iris, devoid of extraneous coloring matter but suitably tinted, "*Said iris portion having a * * * serrated back surface which reflects light of a color similar to the color of the transparent material, said iris portion having a frustro-conical back surface, and the serrations on the back surface of the iris portion being more closely spaced near the * * * pupil portion than at the periphery * * ** in order to provide a graduated tinting of the iris"; and second, a simulated pupil likewise devoid of extraneous color-

ing matter, "*said pupil portion having a smooth, flat,* relatively non-reflective *back surface which appears black.*" (Emphasis by the Court.)

## Prior Art

The artificial eye of the prior art comprised the following elements: first, a hemispherical shell of suitable material, either painted metal or opaque white plastic, to simulate the eyeball; second, an annular component of transparent celluloid or plastic, the reverse surface of which was conical or flat, and either radially or semi-helically serrated from the periphery of the said component to the periphery of an inner annular component, to simulate the iris; third, an inner annular component of the same transparent material, the rear surface of which was either flat or concave; and fourth, a disc or button, suitably colored either blue or brown, disposed behind the iris. It was common knowledge upon the introduction of plastics as a substitute for metal that the first, second and third elements could be integrally molded in a single operation. The specific prior art references hereinafter discussed disclose several variants of the artificial eye as we have herein described it.

There were commonly known variants of the second and third elements hereinabove described, to wit, the iris and pupil components. The simulated color of the iris was imparted in one of two ways: either by the utilization of a color disc, the peripheral rim of which was of a darker tone than the inner area immediately surrounding the pupil, or the utilization of a color ring, either painted or printed, disposed on the rear surface of the peripheral rim. It appears that in the latter variant the inner area immediately surrounding the pupil was semi-transparent and colorless; the color ring imparted an appearance of color and a gradation thereof. The black appearance of the pupil was produced in one of two ways: either its rear surface was painted or there was disposed behind it a black disc of either paper or fabric. The appearance of depth in the pupil was

produced by an integrally molded stud which projected rearwardly from the simulated pupil; where the stud was utilized the rear surface of the stud was painted.

### Specific Prior Art References

The Marcus Patent, No. 1,763,312, issued on June 10, 1930, covers "An improvement in artificial eyes, and particularly * * * that class of artificial eyes which is intended for use in toy figures, such as dolls and the like." The invention of this patent is defined in claim 8 thereof as follows: "In an artificial eye comprising a body member, a lens member, means providing a pupil visible at the centre of the lens member, and the *rear surface of the lens member surrounding the pupil being radially corrugated*, the combination therewith of a plurality of separately formed rings *of differently colored material* said rings being arranged concentrically with respect to each other and to the pupil and being arranged behind the lens and visible through the *corrugated portion of the lens* so that the colors of the different lens are made to blend into each other as viewed through the lens." (Emphasis by the Court.)

The specification of the patent specifically recommends line 89 of page 1 to line 14 of page 2, that the concentric rings be suitably tinted. It is therein stated: "These rings 4 and 5 may be made of any appropriate material and of any desired colors according to the artistic dictates of the manufacturer. They may be opaque, transparent, or semi-transparent but it has been found that an excellent effect may be obtained by making them, as well as the disc 3, of thin sheet celluloid *slightly tinted in color,* as for instance blue, the ring 4 being *of a tint slightly darker than the material of the disc 3,* and the ring 5 being *still another shade darker,* it being here noted that by using *semi-transparent material of this character the portions of the disc and rings which overlie each other will have a cumulative color value."* It is therein further stated: "The relative color value of these parts

may obviously be altered at will by making the different parts *of slightly differently tinted materials."* (Emphasis by the Court.) We regard this structure as a substitute for the color disc of the prior art; it apparently performs the same function.

The specification further recommends, line 22 to line 25, of page 2, that the "lens member," identified in the quoted claim may be suitably tinted. It is therein stated: "This lens may be formed of any appropriate material such as glass, celluloid or the like. It is preferably colorless, but may be of a *slightly tinted color, if preferred."* (Emphasis by the Court.) There can be no doubt that if, as the patent teaches, "the rear surface of the lens member surrounding the pupil" is "radially corrugated," the triangular facets of the serrated surface will diffuse and reflect light of the color of the material, either blue or brown; the intensity of color will necessarily depend on the depth of the tint. This would be obvious to the person skilled in the art. Any doubt is dispelled on further examination of the specification.

The effect of the lens member, the rear surface of which is radially corrugated, is described in the specifications, at lines 104 to 118, inclusive, of page 2, as follows: "The magnifying effect of the lens upon the serrations, *the reflection of light rays from the encircling angularly disposed surfaces of the corrugation* * * *, and the diffusion of said rays due to the multitude of radial lines produced by the corrugations, all combine to give an appearance of great depth and to at the same time at least partially obliterate any definite outline of either the corrugations * * * or the serrations * * *. As the point of observation is moved from one position to another the refraction and defusion (sic) of light causes a very marked apparent difference in the size and contour of the pupil so that an almost life-like appearance is secured." (Emphasis by the Court.) The inventor clearly recognized and stated in unmistakable language that the serrated surface reflects light; if the lens member

is slightly tinted, as the patent recommends the serrated surface will reflect light of a color similar to the material of which the lens member is made. The intensity of color will depend upon the depth of the tint.

The defendant urges that the lens component of the invention of the cited reference and the lens component of the invention of the patent in suit differ in that in the former the radial serrations are more closely spaced near the periphery of the iris than at the pupil portion. The specification of the cited reference makes such a recommendation but the claims of the patent, particularly the one hereinabove quoted, are not so limited. The difference, however, is minor and does not detract from the significance of the disclosure. It is clear that *Marcus* recognized that if the grooves were "deepest and broadest adjacent" to the pupil component he could produce the effect which he desired. *Samolewitz* recognized that the *usual radial serrations* produced a "greater intensity" of light reflection near the pupil, supra. This was not a major discovery, particularly in view of what was clearly disclosed by the prior art.

The *Marcus* Patent, No. 2,254,232, issued on September 2, 1941, and owned by the defendant, covers an artificial eye, the lens component of which is made of acetate plastic. The invention is defined in claim 2 of the patent, the pertinent disclosure of which reads as follows: "A doll eye comprising a generally hemispherical sheet metal eye shell, * * *, and a *lens made of a single body of transparent material*, said lens including an iris portion having an outer surface conforming to the spherical surface of the eye shell, and having a *frustro-conical inner surface* and further including a cylindrical stud projecting rearwardly * * *, the rear surface of the iris portion surrounding the stud being provided with *radial serrations*, said serrations terminating within the periphery of the lens, and thereby providing a comparatively thin marginal portion, * * *, and black coloring material

on the inner end of the stud." (Emphasis by the Court.) We have eliminated the description of the shell structure in which the lens component is mounted; this disclosure is not relevant here. The radial serrations are necessarily more closely spaced near the center, the pupil component, than at the peripheral rim of the iris component.

The lens component of this invention is described in the specification, line 54 of column 1 to line 14 of column 2, page 1, as follows: " * * * a lens consisting of a *single piece of transparent material* including a cylindrical stud projecting rearwardly from and *formed integrally with the iris portion of the lens.* * * *. The back of the lens immediately surrounding the stud is preferably provided with *radial serrations* to simulate iris lines. * * *. The inner end of the stud is painted with black coloring and acts as a pupil, this pupil being of great depth because the length of the stud is added to the thickness of the lens." The specification, line 49 to line 51 of column 1, page 2, discloses "these serrations may be made unusually deep, distinct and accurate, * * *." (Emphasis by the Court.)

The specification, line 59 to line 69 of column 1, page 2, makes the following reference to color: "the lens may be printed with a suitable coloring material for the iris, * * *. Blue is used to simulate blue eyes; brown for brown eyes, and so on. The coloring material is predominant around the edge or smooth marginal portion * * * of the lens, but is *carried inwardly somewhat over the serrated portion* * * *. The serrations themselves break up the printing, and as a result the coloring is lighter toward the center and darker toward the periphery, which is as it should be." (Emphasis by the Court.) The serrated portion, if we understand the teaching, is colored only along the periphery and the area immediately adjacent thereto, so that the inner area remains semi-transparent and colorless; this gives an appearance of a gradation of color. Examples are to be found in Ex-

hibit P–1, and Exhibits D–3, D–36 and D–38, relevant examples of prior art.

The cited reference describes an artificial eye comprised of the following elements: first, a hemispherical shell of suitable material, either metal or plastic, the forward and outward portion of which—surrounding the lens component —is coated white to simulate the eyeball; second, an annular component, the reverse surface of which is *frustro-conical and radially serrated* from the peripheral rim of the said component to the periphery of an inner annular component to simulate the iris; third, a color ring, either blue or brown, printed or otherwise applied on the inner surface of the peripheral rim and extending somewhat, but not entirely, into the grooves of the serrated surface; and fourth, an inner annular component, the rear surface of which is provided with a cylindrical stud, the reverse face of which is painted black. It is clear that in the radially serrated surface herein described the serrations are more closely spaced near the center than at the outer periphery, although the inventor makes no claim to this feature. (See Figs. 1 and 3 of the reference). The lens member, second and fourth elements, is molded of a single piece of acetate plastic.

It seems rather obvious that if the lens component is suitably tinted, either brown or black in the manner taught by the earlier *Marcus* Patent, No. 1,763,-312, supra, the reverse surface of the iris, described in the foregoing paragraph as the second element, will reflect light of a color similar to the color of the lens component, an essential feature claimed by Samolewitz in the patent in suit. If the serrations are "unusually deep, distinct and accurate," as taught by Marcus in the patent under discussion, the triangular facets will produce a substantial reflection of colored light, particularly if the artificial eye is mounted in the usual manner in a doll head which is completely closed. There will also be an appearance of a gradation of color produced by the frustro-conical surface, a feature which is also claimed by

Samolewitz in the patent in suit. It seems to be equally obvious, if the teachings of Grubman, infra, are followed, that the application of extraneous coloring matter to the rear surface of the pupil will be unnecessary.

The *Grubman* Patent, No. 1,963,129, issued on June 19, 1934, and owned by the defendant, covers an artificial eye for use in a doll head. The invention of this patent is defined in claim 18 as follows: "A doll's eye comprising an eye shell of transparent material, said eye shell being provided with a white opaque area representing the eye ball and surrounding a transparent area corresponding to the iris of the eye, *said transparent area being provided with radial lines,* and an inner member fixed within the shell, said inner member including an annular iris portion of outwardly convex section *appropriately colored to simulate the iris of the eye* and a central portion *simulating the pupil of the eye and surfaced with a dark non-reflecting fabric,* the outwardly convex section of the iris portion of the inner member being shaped to give the iris background a curvature which diverges inwardly away from the eye shell with its radial lines and toward the pupil of the eye." (Emphasis by the Court.)

The inventor states in the specification, at lines 19 to 43 of page 1: "one object of the present invention is to simplify the mode of obtaining the radial lines ordinarily provided about the iris of the eye, and at the same time secure an apparent depth of the eye. To this end I provide an eye shell having a transparent circular portion corresponding to the iris of the eye which I provide with radial lines in a very simple manner, as by printing the same directly on the transparent material, and I further provide the iris of the eye with an appropriately colored annular background which is spaced rearwardly a substantial distance from the eye shell with its radial lines. The radial lines and the background are both visible through the transparent portion of the shell, but the relative displacement of the same rear-

wardly of the shell creates an appearance of depth in the eye. The background may, of course, further include *a dark central portion simulating a pupil of the eye* and this portion is also spaced a substantial distance rearwardly of the eye shell and preferably also rearwardly of the background of the iris of the eye." (Emphasis by the Court.)

It is clear from the specifications that the radial lines may be either printed on the transparent material or impressed into the material. We are here concerned only with radial lines produced in the latter manner. The specification, at lines 9 to 11 of page 3, expressly states "that the iris lens may be produced *by impressing indentations* * * * on the under surface of the outer celluloid coating and *without the use of printing ink.*" (Emphasis by the Court.) An eye which embodies as a feature the indented radial lines is described in claims 6 and 19. The radial lines are therein described as "wedge shaped lines extending radially inward from [the] periphery" of the iris.

The claim hereinabove quoted, as well as other claims, describes the simulated pupil as follows: "a central portion simulating the pupil of the eye and surfaced with a dark non-reflecting fabric." There are other claims, however, not limited to a lens element of which such a pupil is a component; see, for example, claims 4 and 5, inclusive, in which the simulated pupil is described simply as "a black central portion representing the pupil of the eye." These claims would appear to be consistent with the specification of the patent, lines 19 to 27 of page 3, wherein it is stated: "*The central perforation may be left completely open,* or uncovered with any black material, and a perfect simulation of a black pupil can, in that way, be obtained. Such an effect, produced without the assistance of a black backing, *is due to the fact that the interior of the doll head in which the eye is mounted, is completely closed* and therefore shaded from the light on the outside, *therefore providing a perfectly dark background for the pupil.*" (Em-phasis by the Court.) The disclosure of claim 24 is particularly pertinent because the pupil is therein described as "a central apperture coincident with a simulated pupil."

The cited reference clearly discloses an artificial eye which comprises the following elements: first, a hemispherical plastic shell, the forward and outward portion of which—surrounding the lens component—is white to simulate the pupil of the eye; second, an annular component, the reverse surface of which is radially serrated from the periphery of the said component to the periphery of an inner annular component, to simulate the iris; third, an inner annular component, the reverse surface of which is free of extraneous coloring matter, either paint or fabric, to simulate the pupil; and fourth, a disc or button suitably colored, either blue or brown, disposed behind the iris. These elements, except for the disc or button, may be integrally molded of either celluloid or other suitable material. The color disc is the color disc of the prior art hereinabove described, except for the curvature, which the inventor claims is essential.

The *Cohn* Patent, No. 2,425,510, issued on August 12, 1947, and owned by the defendant, covers primarily an improvement in the conventional eye of the prior art. The claims are limited to specific modifications of this improvement. The specification, however, discloses an artificial eye comprised of the following elements: first, a hemispherical shell, preferably of opaque plastic, provided with a center recess and apperture in which the lens component is mounted; second, a circular component, "*suitably tinted to simulate the blue or brown color of the lens of the eye,*" the rear surface of which is conical and radially serrated; and third, an inner circular component, the rear surface of which is provided with a cylindrical stud to simulate the pupil of the eye. (Emphasis by the Court.) It should be noted that the specification recommends that the end of the stud be "sprayed with a black ce-

menting fluid to provide a black pupil center."

The significance of the reference lies primarily in its disclosure of a simulated iris "*suitably tinted to simulate the blue or brown color of the lens of the eye.*" (Emphasis by the Court.) Specification, lines 35 to 37 of column 3. The specification, lines 1 to 5 of column 2, states that the parts may "be produced as colored plastic moldings, *making subsequent coloring operations unnecessary* and producing a color depth for all of the eye parts which imparts to the eye a desired natural appearance." (Emphasis by the Court.) There can be no doubt that a simulated iris of the type described is necessarily devoid of *extraneous coloring matter*, an advantage claimed by Samolewitz for his lens component. It should be noted that in five of the seven claims of the Cohn patent, "the iris part * * * colored to simulate the lens of an eye" is defined as an essential element of the invention. The inventor clearly contemplated the utilization of a lens member devoid of extraneous coloring matter, the said lens member being suitably tinted "to simulate the blue or brown color of the lens of the eye."

The defendant has offered in evidence two commercial artificial eyes, Exhibit D–42 and Exhibit D–44, in each of which, it is urged, the elements of the Cohn invention are incorporated. The elements are present in each of the structures, but, in our opinion, the exhibits are not fairly illustrative examples. The lens member is mounted in a recess which provides a white, rather than a dark, background; this feature adversely affects the reflection of incident light.

Exhibit D–42 is an artificial eye in which the iris component is blue. The color, however, is so lacking in intensity that there is imparted only a faint blue cast; in fact, the iris component appears almost colorless. While it has been testified that this element follows the teachings of the patent, we doubt it. The specification of the patent requires that the iris component be "suitably tinted to simulate the blue * * * of the lens of the eye." This requirement would seem to demand a sufficient depth of color to produce the desired result, to wit, a blue iris of satisfactory tone and color. The appearance of an intensity of color could be further produced by the utilization of a color ring of deeper tone disposed around the inner surface of the peripheral rim, a practice of the prior art. This rather obvious modification, however, is not necessary.

Exhibit D–44 is an artificial eye in which the iris component is brown; this eye is apparently a better commercial product. We observe, however, that the appearance of an intensity of color is produced, as we hereinabove suggested, by the utilization of a color ring of deeper tone, disposed around the inner surface of the peripheral rim. The serrated rear surface of the iris component reflects light of a color similar to the color of the transparent plastic of which it is made, a function performed by the serrated rear surface of the Samolewitz invention and claimed as an essential feature which distinguishes the invention from the artificial eye of the prior art.

We entertain no doubt that if the lens component of the Cohn invention was mounted in a light-proof doll's head in such a manner as to permit the utilization of the dark interior as a background, the structure would be an infringement of claims 1 and 3 of the patent in suit. It follows that if the rear surface of the lens component was frustro-conical and radially serrated, a structure in which these features were also incorporated would be an infringement of claims 2 and 4 of the patent in suit. The utilization of black paint on the rear end of the stud, in simulation of the pupil, would not avoid infringement; such a stud would be regarded as an obvious equivalent of the dark interior of the doll's head. This conclusion is supported by the testimony of one Harry Shapiro, a patent attorney called as an expert witness by the defendant. See record, pages 443, et seq. He frankly admitted that if the Cohn invention was mounted in such a manner as to provide it with a dark

background, the structure so mounted would be an infringement of the patent in suit.

When we first studied the cited reference we entertained some doubt as to its relevancy, but upon more careful analysis, particularly in the light of the teachings of the prior art hereinabove discussed, we are convinced that its disclosures would be most instructive to the person possessed of the expected knowledge and skill of the art. We are equally convinced that to such a person the step from Cohn to Samolewitz, in the light of Marcus and Grubman, would be obvious.

The necessary limits of this opinion will not permit a comprehensive discussion of other cited references. The relevancy of the Marcus Patent, No. 2,051,876, issued on August 25, 1936, and owned by the defendant, lies in its disclosure of a lens component, the rear surface of which is frustro-conical and radially serrated. The relevancy of the *De Cesare* Patent, No. 2,206,545, issued on July 2, 1940, lies in its disclosure of a lens component, the rear surface of which is radially serrated. It would appear from Fig. 4 and Fig. 17 of the former, and Fig. 2 of the latter, that the radial serrations are more closely spaced near the periphery than at the center. We heretofore observed, however, that this is characteristic of radial serrations.

## Validity

█ █ The claims in suit cover nothing more than an improvement on the artificial eye disclosed by the prior art. The question presented for determination is whether or not this improvement was such an advance over the prior art as will here support the claim to patentable invention. The purported invention must be appraised in the light of the prior art considered in its entirety. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Saranac Automatic Mach. Corp. v.

Wirebound Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634; and other cases hereinafter cited. Where, as in this case, the claims in issue cover nothing more than an aggregation of known structural elements, they must be scrutinized with a "care proportioned to the *difficulty* and *improbability* of finding invention" in such an assemblage. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at page 152, 71 S.Ct. at page 130. The purported invention must meet the rigid test of patentability established by the many decisions of the Supreme Court in the last two decades.

The purported invention of each of the claims in suit comprises nothing more than an aggregation of structural elements known in the art, to wit, first, a hemispherical eye shell of opaque white plastic to simulate the eyeball; second, an annular component of transparent or semi-transparent plastic suitably tinted to simulate the blue or brown color of the iris, disclosed by Cohn; third, a conical or frustro-conical surface, at the rear of the said iris component, radially or semi-helically serrated from the peripheral rim of the iris component to the periphery of the inner-annular component to simulate the iris lines, disclosed by Marcus, Grubman and Cohn, and otherwise known in the art; and fourth, an inner annular component of transparent plastic, the rear surface of which is devoid of extraneous coloring matter to simulate the pupil, disclosed by Grubman. The lens member, which embodies the iris and pupil components, is molded of a single piece of suitably tinted plastic.

█ █ When the claims in issue are read and construed in the light of the prior art, as they must be, the absence of patentable invention seems to be clearly demonstrated. It is well established that: "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention." *Lincoln Engineering Co. v. Ste-*

wart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008; see also Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334, and the other cases hereinabove cited in our initial paragraph under the heading "Validity." We are of the opinion that the invention of the patent in suit does not meet the rigid test of patentability prescribed by the cited cases.

The claim to patentable invention must necessarily rest on the assertion made in the specifications that the radially serrated surface of the lens component performs a dual function, to wit, the function heretofore performed in the earlier artificial eyes, and the additional function now ascribed to it. The patentee explains in the specifications, lines 25 to 37, of column 6: " * * * the radial serrations serve the dual purpose of providing the desired reflection of incident light and of simulating natural iris lines. Indeed, in certain doll eyes of prior construction *it has been customary to provide radial serrations for the express purpose of simulating natural iris lines,* and without any thought of producing a reflection of incident light in contrast with an adjacent non-reflective pupil portion, for in such eyes it has been customary to provide a color disc or black plate behind the iris portion." (Emphasis by the Court.) This explanation adds nothing to the claim to patentable invention.

The patentee apparently lays claim to the discovery that the serrated surface of the prior art, embodied in a lens component, will reflect light "of a color similar to the color of the transparent material" of which the lens component is made. This claim is difficult to understand, particularly in view of the disclosures of both Marcus and Cohn, supra. While it is true that neither Marcus nor Cohn made any claims to this feature, we have seen, in physical exhibits produced by the defendant, that the serrated surface of the prior art, disposed on the rear surface of a lens component suitably tinted, will reflect light "of a

color similar to the color of the transparent material" of which the lens component was made. This is particularly true of exhibits D–42 and 44, artificial eyes admittedly made under the Cohn patent, supra.

■ This discovery, if it was a discovery by Samolewitz, adds nothing to his claim to patentable invention. The fact that those who preceded the patentee neither appreciated all of the physical properties inherent in the serrated surface of the prior art nor perceived all the uses to which this element was accomodable by reason of these physical properties, neither minimizes the effect of the earlier disclosures nor enhances the claim to patentable invention. General Electric Co. v. Jewel Incandescent Lamp Co., D.C., 47 F.Supp. 818, 825, and the cases therein cited. Affirmed 3 Cir., 146 F.2d 414, affirmed 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43. The patentability of an article of manufacture must be found in the structural elements of which the invention is comprised and not in the functions ascribed to one or more of these elements. Ibid. This is particularly true where, as here, there is nothing which distinguishes the essential structural element of the purported invention, asserted to be new, from a similar or comparable element of the prior art, except an additional function ascribed to it. Ibid.

The case of General Electric Co. v. Jewel Incandescent Lamp Co., supra [47 F.Supp. 827], was decided by this Court. The essence of the invention was an etched mat surface which, according to the specification of the patent, "increased the resistance of a frosted glass bulb to breakage." The language of our opinion in that case, when paraphrased, is applicable here: "There was nothing which distinguished" the serrated surface defined by Samolewitz from the serrated surface described by those who preceded him, "except the function ascribed to it in the particular article of manufacture," to wit, the reflection of light of a color similar to the color of the transparent material of which the lens component is

made. "The novelty of the invention, if any, lay not in the structural element but in [its] function."

We stated further in the cited case: "The critical observation of Justice Reed in the case of General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, at page 371, 58 S.Ct. 899, at page 903, 82 L.Ed. 1402, is apposite: 'But the vice of a functional claim exists not only when a claim is "wholly" functional, if that is ever true, but also when the inventor is painstaking when he recites what has already been seen, and then uses conveniently functional language at the exact point of novelty'." We are of the opinion that that is exactly what Samolewitz did; he defined the structural elements known in the art and then used conveniently functional language at the exact point of novelty. The structural elements of his invention are otherwise not distinguishable from the structural elements of the artificial eye of the prior art.

The utilization in the purported invention of an annular component of transparent plastic, devoid of extraneous coloring matter, to simulate the pupil of the eye, likewise adds nothing to the claim to patentability. The utilization of such a component was taught by Grubman as early as 1934. This component performs the same function in identically the same manner in both the invention of Grubman and the purported invention of Samolewitz. It is interesting to note that in the patent in suit the rear surface of the pupil component is described as "smooth" and "flat." The patentee now admits that this feature is not essential; he admits that the rear surface may be either concave or convex. This is tantamount to an admission that the structural elements of the prior art disclosed by Grubman, and the purported invention are not distinguishable.

We are of the opinion that the critical observation of the Supreme Court in the case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at page 152, 71 S.Ct. at page 130, is apposite: "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

The defendant appears to rely rather heavily on the fact that the prior art references, hereinabove discussed by the Court, were considered by the Patent Examiner and cited by him in support of his rejection of many of the original claims of the patent application. An examination of the file wrapper discloses that the objections of the Examiner were overcome and the claims in suit were allowed only after personal interview. We might observe, in fairness to the Examiner, that the Court had the benefit of a distinct advantage which he lacked, to wit, an interested opponent to present the other side.

The artificial eye of the patent in suit may be an improvement over the artificial eye of the prior art but it is clearly not a patentable improvement. The conception required nothing more than a knowledge of the art and the expected skill of the artisan; it required no more ingenuity than that of a mechanic skilled in the art. The claims in issue are therefore invalid because of the lack of invention over the prior art and for the reasons hereinabove discussed.

### Appropriation of Trade Secrets

The defendant has included in its answer a counterclaim in which it charges

the plaintiff with the appropriation of certain trade secrets and seeks the usual relief, to wit, an injunction, an account and recovery of profits, general damages, and the destruction of sketches and blueprints. The cause of action is predicated upon the allegation that one Harry Brudney, formerly an employee of the defendant, wrongfully disclosed the trade secrets to the plaintiff, a corporation which he organized, and that the plaintiff appropriated and utilized the subject matter of the secrets in the manufacture of dolls' eyes.

### Relationship of the Parties

Harry Brudney entered the employ of the Conmar Products Corporation on January 4, 1937, and thereafter continued in its employ until sometime in 1947, when he entered the employ of the defendant. When he entered the employ of the Conmar Products Corporation he executed a contract, under the express terms of which he agreed "not to disclose any information obtained by him while in the employ of the said Conmar Products Corporation or its subsidiaries, to any third person, company, corporation or other organization." There is admittedly some relation between the Conmar Products Corporation and the defendant; the exact nature of it is not disclosed by the evidence. This fact, however, becomes relatively unimportant in our determination of the ultimate issues.

Harry Brudney entered the employ of the defendant in 1947, and thereafter continued in its employ until October of 1952, when he resigned. The title of the position which he held during the critical period, 1950 to 1952, is uncertain, but this is unimportant. It clearly appears from the evidence that during the critical period he generally supervised production, and in the performance of his duties had access to the research and development programs of the defendant. Whether or not he had access to the particular trade secrets here in issue we are not required to decide for reasons hereinafter apparent.

The plaintiff was organized by Harry Brudney and others in November of 1953, and thereafter he was elected its president and became its general manager. Thereafter—it does not appear when—the plaintiff commenced the manufacture of dolls' eyes, Exhibits D–9 and D–10, which were first commercially marketed in May of 1954. It seems reasonable to assume that these eyes were manufactured shortly before their appearance on the commercial market.

There can be no doubt that Harry Brudney enjoyed an executive status while in the employ of the plaintiff and that the relationship between him and the plaintiff had been such, even in the absence of contract, as to require that he not disclose, or otherwise utilize, any trade secrets of the defendant. The plaintiff, which he organized in November of 1953, was likewise under an obligation not to utilize any trade secrets imparted to it by him.

However, the primary question presented for determination is whether or not the articles of manufacture, which the defendant now contends were trade secrets, were in fact trade secrets. We shall direct our attention to this question.

### Trade Secrets

The purported trade secrets, defined by the defendant in response to a request by the Court, are articles of manufacture. They are specific variants of individual movable eyes suitable for mounting in dolls' heads or other toys. These trade secrets must be separately considered and analyzed. The proper approach requires an analysis of not only each article of manufacture but also the members of which it is comprised.

*Purported Trade Secret A—(B of Exhibit D–34)*

This is an individual movable eye described in a patent to *Wolfe*, No. 2,700,-248, issued on January 25, 1955, on an application filed on July 3, 1952, and owned by the defendant. The variants of the invention therein described are specifically defined in twelve claims. The invention described therein comprises the following: first, a housing shell of two segments, the front segment of which is

provided with slots or bearings suitably positioned to receive oppositely extending trunnions; second, an eye member, the rear peripheral rim of which is grooved to receive the trunnions; and third, a pair of oppositely extending trunnions, integrally molded with a weight of suitable metal, diametrically disposed to coincide with the slots or bearings of the front segment of the housing shell. When the elements are assembled, the eye member is rotatably mounted within the housing shell.

The defendant admits that an individual movable eye in which the elements of this invention are embodied, was manufactured and commercially marketed by it in October of 1953, more than a year before the plaintiff marketed its individual movable eye. (Exhibit D–18.) It further appears from the undisputed evidence (record, page 341 et seq.) that an individual movable eye, identical in all its structural elements, was manufactured and commercially marketed by the defendant in 1948, or shortly thereafter; this eye is still on the market. (Exhibit D–38.) The defendant does not admit that these eyes are identical, but it clearly appears, on mere visual comparison, that they are. We are of the opinion, although we are not asked to decide the question, that the claims of the Wolfe patent are invalid; there was a public use and sale of the invention more than a year prior to the date of the application for the patent.

It is obvious that upon a mere inspection of either of the above-described articles of manufacture, the structural elements of which they are comprised and the manner in which they are assembled would be revealed. A person of ordinary mechanical skill, particularly one with a knowledge of the art, could reproduce these articles without further instruction or experimentation. When these articles of manufacture, Exhibits D–18 and D–38, were commercially marketed, the latter in 1948 and the former in 1953, there was a complete public disclosure of the subject matter of the trade secret. The defendant, having

made these disclosures, cannot recall the subject matter to privacy and now claim it as a trade secret.

*Purported Trade Secret B—(D of Exhibit 34).*

This is the individual movable eye of the Samolewitz patent, modified by using a housing member, the interior surface of the rear segment of which is black. This trade secret is unmistakably the subject matter of the Samolewitz patent. This is clearly demonstrable from the evidence here produced by the defendant.

The defendant states that this subject matter was a trade secret until May of 1954, "when Dollac manufactured and sold its first eye." This statement is clearly inconsistent with the contention made by the defendant in support of its charge of patent infringement. The charge of infringement made against the plaintiff in this very case was based upon the allegation that the plaintiff employed, in an individual movable eye, the eye member of the Samolewitz patent in a housing structure, the interior of the rear segment of which is black.

It was contended that an eye member of the Samolewitz patent, mounted in any housing member provided with a dark background, would be an infringement of the patent. (See page 443 of the record.) We agree with this contention. While the patent is not a pioneer, the defendant is entitled to claim a reasonable range of equivalents; the defendant is not limited solely to the specific structure described as an invention, but is entitled to claim as its invention any variant thereof in which there is a substitution of a member which is an obvious equivalent of a member defined by the patent. It seems obvious that the dark interior of the rear segment of a housing shell would be the equivalent of the dark interior of a doll head; if the patent is valid the substitution of the former for the latter would not avoid the charge of infringement.

The conclusion of the Court that the trade secret is the subject matter of the Samolewitz patent is supported by the

evidence produced by the defendant. The defendant has offered in evidence, as a typical example of an individual movable eye manufactured under the Samolewitz patent, a completed eye in which the eye member is rotatably mounted in a housing member, the rear segment of which is provided with a suitable dark background. (Exhibit D–39.) This individual movable eye is fully described in the testimony of one Harry Shapiro, a patent attorney called as an expert witness by the defendant; he testified, without equivocation, that this article of manufacture embodied all the essential features of the invention of the Samolewitz patent. (See page 348 et seq., of the record.) It is obvious, upon visual examination, that this individual movable eye embodies also the essential features of the puported trade secret.

 The defendant may not resort to the doctrine of equivalency to support a charge of infringement and at the same time recapture and withdraw to privacy as a trade secret an obvious variant of the invention which the patentee is presumed to have placed in the public domain in return for the patent monopoly. If this were permitted, the very purpose of the patent law could be defeated by the adoption of this rather simple expedient. Where, as here, the subject matter of a patent and that of a trade secret are substantially identical, the issuance of the patent must be regarded as a disclosure of the trade secret.

 It follows that if we accord the Samolewitz patent the broad construction claimed for it, the issuance of the patent must be construed as a full and adequate disclosure not only of the invention therein described, and the variants thereof, but also of the identical subject matter theretofore held as a trade secret.

*Purported Trade Secret C—(A of Exhibit D–34).*

This is an individual movable eye which embodies either the eye member of the Samolewitz patent, supra, as defined in claims 3 and 4, or the lens component, as defined in claims 1 and 2. This eye, although here claimed as a trade secret, was fully disclosed in the said patent, which, it will be recalled, issued on November 3, 1953, approximately six months before the plaintiff's individual movable eye was placed in the public market. This eye is defined as an invention in claims 6 and 15.

We have heretofore fully analyzed and discussed claims 3 and 4 of the patent, each of which covers a "finished doll eye intended for use in a light-proof enclosed doll head." While these claims, as well as others, are limited to the eye member, it clearly appears from the specification that the disclosures are sufficiently broad to cover an individual eye so constructed as to be rotatably mountable in the individual housing member or eye shell of the prior art, as for example, Exhibits D–18 and D–38, supra. In fact, claims 1 to 6, inclusive, of the patent defines the invention in the singular, to wit, "a finished doll eye"; this is also true of claims 8 to 11, inclusive. The only reference to "a finished doll eye-set" is in claims 6 and 16, and in the corresponding description in the specification. (See also Fig. 4 of the drawings.)

The specification of the said patent, line 62 to line 66 of column 7, further reads: "While Figs. 1 through 5 show a pair of eyes molded together, it will be understood that the *eyes may be molded separately*, that is, *each eye may be molded with two trunnions and each be moved by its own weight arm and weight.*" (Emphasis by the Court.) When this specification is read together with the claims of the patent, and particularly claims 6 and 15, we find a complete disclosure of an individual movable eye in which the invention of the Samolewitz patent is embodied. If this were not true it would have been unnecessary for the specification to describe the essentials of a rotatable individual eye, to wit, the trunnions and the weight arm. It should be noted here that the utilization of a weight arm, provided with a suitable weight, was old in the art. See

the patent to Popovich, No. 2,039,928, issued on May 5, 1936, and the patent to Wagler, No. 2,219,855, issued on October 29, 1940; it will be observed that these patents have expired.

This trade secret, given the broad interpretation claimed for it by the defendant, would cover an individual movable eye of the prior art, for example, Exhibits D–18 and D–38, supra, in which the eye member of the Samolewitz claim is mounted. Any doubt is dispelled upon examination of claims 6 and 15, each of which define as essential elements of the eye member a "weight portion" and "means for pivotally mounting the eye." When these claims are read together with the corresponding description in the specification, supra, there can be little doubt that the patent covers the subject matter of this trade secret.

The principles hereinabove discussed under "Purported Trade Secret B," are applicable here. It follows that the issuance of the Samolewitz patent must be regarded not only as a disclosure of the invention therein described, but also of the subject matter theretofore held as a trade secret.

*Purported Trade Secret D—(C of Exhibit D–34).*

This is an individual movable eye in which the eye member is provided with integrally molded trunnions, and in which the lens component of the Samolewitz patent is embodied. This eye is disclosed in claims 6 and 15 of the patent and described in the corresponding description of the specification in line 62 to line 66 of column 7, hereinabove quoted. When this description is read together with the description which precedes it, lines 42 to 51, there can be no doubt that there was a disclosure of the individual movable eye, here claimed as a trade secret.

### Applicable Law of Trade Secrets

 It is now well established that the law recognizes a property right in trade secrets, and a court of competent jurisdiction will protect the right against invasion by one who appropriates trade secrets to his own use in violation of a contractual obligation or confidential relationship. Darsyn Laboratories, Inc., v. Lenox Laboratories, Inc., D.C., 120 F.Supp. 42, and the cases therein cited, at page 54; affirmed 3 Cir., 217 F.2d 648, certiorari denied 349 U.S. 921, 75 S.Ct. 661, 99 L.Ed. 1253, see also Restatement of the Law, Torts, Sections 757 and 758. The principle is so well established that a further citation of authority seems unnecessary. However, the right to protection terminates upon public disclosure of the trade secrets by the owner; the right to protection begins and ends with the life of secrecy. Ibid.

 The last quoted rule is applicable even where there is a contract. It has been held that even a contractual obligation to respect the owner's property right in a trade secret terminates with the public disclosure of the secret by the owner in the absence of a specific provision in the contract requiring the promisor to adhere to his contractual obligation after such disclosure. Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632, 637, certiorari denied 317 U.S. 651, 63 S.Ct. 46, 87 L.Ed. 524; Conmar Products Corp. v. Universal Slide Fastener Co., 2 Cir., 172 F.2d 150, 155, 156. This rule is particularly applicable where, as here, the subject matter of the purported trade secret is fully embodied in a patent and is publicly disclosed upon its issuance. Ibid. The contract between the Conmar Products Corporation and Harry Brudney, supra, contains no such specific provision. Therefore, even if it should be determined that the present defendant, as a subsidiary of the Conmar Products Corporation, was a beneficiary of the contract and had a right thereunder, the contract will not avail it in this litigation.

The rights and obligations created by contract were fully discussed by Judge Learned Hand in the case of Picard v. United Aircraft Corporation, supra, 128 F.2d at page 637. It was therein stated: "The promisor should not be held to an interpretation extending the agree-

ment to the possibility that the patent may prove invalid, because the applicant is proposing to broadcast the invention to the world at large, reserving as his protection only the claims which he may secure; and there is ordinarily no reason to suppose that he means to exact any greater protection against the promisor than he will have against others. At any rate, if he does, he should say so."

We direct our attention first to purported trade secret "A." We heretofore held that the subject matter of this trade secret was fully revealed upon the public sale, in 1948 and 1953, of articles of manufacture in which the subject matter of the purported secret was revealed. The public sale of these articles terminated the life of secrecy and consequently the right of the defendant to claim the subject matter as a trade secret. Skoog v. McCray Refrigerator Co., 7 Cir., 211 F. 2d 254; Northup v. Reish, 7 Cir., 200 F.2d 924; Sandlin v. Johnson, 8 Cir., 152 F.2d 8; Kinnear-Weed Corp. v. Humble Oil & Refining Co., D.C., 150 F.Supp. 143; Newell v. O. A. Newton & Son, D.C., 104 F.Supp. 162; Boost Co. v. Faunce, 17 N.J.Super. 458, 86 A.2d 283; Carver v. Harr, 132 N.J.Eq. 207, 27 A.2d 895. Therefore, even if it should be determined that the individual movable eye manufactured and sold by the plaintiff embodied this trade secret, the defendant would not be entitled to relief. The plaintiff's product was not commercially marketed until 1954, long after the defendant had publicly disclosed this purported trade secret.

We next direct our attention to purported trade secrets "B," "C," and "D." We heretofore held that the subject matter of each of these trade secrets was fully covered by the claims of the patent to Samolewitz and the corresponding descriptions in the specification. The issuance of the patent was therefore a public disclosure of the subject matter of these trade secrets. Darsyn Laboratories, Inc., v. Lenox Laboratories, Inc., supra, 120 F.Supp. at page 54; Conmar Products Corp. v. Universal Slide Fastener Co., and Sandlin v. Johnson, both

supra; Speaker v. Shaler Co., 7 Cir., 87 F.2d 985, certiorari denied 301 U.S. 695, 57 S.Ct. 923, 81 L.Ed. 1350. The defendant surrendered its right to claim as a trade secret the subject matter disclosed and claimed in the said patent. Ibid. The issuance of the patent placed the subject matter in the public domain in return for the patent monopoly.

The defendant would be entitled to relief, predicated upon the alleged misappropriation of trade secrets, only upon proof that prior to the issuance of the patent the plaintiff appropriated the subject matter and utilized it to its own advantage. Chesapeake & O. Ry. Co. v. Kaltenbach, 4 Cir., 95 F.2d 801; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, certiorari denied 298 U.S. 673, 56 S.Ct. 938, 80 L.Ed. 1395. While the defendant would not have a right to injunctive relief, it would have a right to monetary damages. Ibid.

The principle of the cited cases, however, is not applicable here because the present case is distinguishable on its facts. The undisputed evidence discloses that the plaintiff first commercially marketed its individual movable eye in May of 1954, fully six months after the Samolewitz patent had issued. It follows that the only remedy available to the defendant was the one first asserted, to wit, the suit for infringement under the patent laws. Darsyn Laboratories, Inc., v. Lenox Laboratories, Inc., supra. The defendant cannot assert a right to any other remedy, particularly where, as here, the claim for patent infringement and the claim for misappropriation of trade secrets cover the same period.

We are of the opinion that the counterclaim, based upon the alleged misappropriation of trade secrets, must be dismissed.

### Claim for Unfair Competition

The defendant has also included in its answer a counterclaim for damages based upon the alleged unfair competition of the plaintiff. The counterclaim, as we construe it, is based upon the charge: first, that Harry Brudney ac-

quired knowledge of the subject matter of the Samolewitz patent prior to its issuance; second, that this knowledge was utilized by the plaintiff; and third, that by reason thereof the plaintiff gained an unfair competitive advantage.

The charge that the plaintiff gained an unfair competitive advantage by reason of the conduct of Brudney is not supported by the evidence; in fact, the charge appears to be solely predicated upon conjecture. The plaintiff was organized in November of 1953, the month in which the Samolewitz patent issued, and did not market its individual movable eye until May of 1954. The defendant, fully aware of the pending application for the patent and of its issuance, apparently made no preparations to manufacture the individual movable eye of the patent until May of 1954, after it learned of the plaintiff's product. This appears from the undisputed testimony of one Robert Prupis, chief engineer employed by the defendant. (See page 275 et seq., of the record). If the defendant suffered any competitive disadvantage, it was ascribable solely to its failure to exploit the patent within a reasonable time after its issuance. The ultimate decision of the Court, however, rests on a further ground.

The defendant in the present case asserted against the plaintiff an appropriate claim for patent infringement. This was the only claim it was entitled to assert in the absence of proof that the plaintiff, prior to the issuance of the patent, wrongfully appropriated and converted to its own use the subject matter of the patent theretofore held as trade secrets.

If the claims in issue, in the patent phase of this litigation, had been held valid and infringed, the defendant would have been entitled to injunctive relief, recovery of profits and general damages for unfair competition. However, the claims in issue having been held invalid, the defendant was not entitled to such relief. It follows that the defendant may not now assert, as an independent claim, a claim for unfair competition which is essentially predicated on the alleged infringement. The claim for infringement having failed, the present claim for unfair competition must likewise fail.

The right of a patent owner to recover damages for unfair competition was sustained in the case of Schreyer v. Casco Products Corp., D.C., 97 F.Supp. 159, affirmed 2 Cir., 190 F.2d 921, certiorari denied 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683. That case is distinguishable from the present case. There the trial judge decided, and was affirmed in his decision, first, that the claims of the patent in suit were valid and infringed; second, that the infringer wrongfully appropriated and utilized the subject matter of the patent prior to its issuance; third, that by reason thereof the infringer was in a position to commercially market its competitive product contemporaneously with the issuance of the patent; and fourth, that the infringer, having gained the competitive advantage, was answerable in damages, to wit, the profits realized therefrom. It is obvious that the ultimate decision of the court on the issue of damages was predicated upon a necessary determination that the patent there in suit was valid and infringed.

We are of the opinion that the counterclaim for unfair competition must be dismissed.

### Claim for Relief Under the Antitrust Laws

The plaintiff has included in his reply to the counterclaim a claim for treble damages and injunctive relief under Section 2 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C.A. §§ 2, 15 and 26, and Section 3 of the Robinson-Patman Act, 15 U.S.C.A. § 13a. The plaintiff and defendant are admittedly competitors engaged in the manufacture of individual movable eyes for dolls and other toys; there is no evidence that the plaintiff is engaged in the manufacture of any other product. We note that the claim under the antitrust laws should have been stated in the original complaint.

**62**

■ This claim, as it now stands, is predicated upon the allegations: first, that the defendant has accumulated and owns a number of patents; second, that the defendant has instituted a number of suits for patent infringement; third, that during the critical period the defendant engaged in a program of price reduction; and fourth, that the conduct of the defendant was accompanied by the intent and design to unlawfully eliminate competition and to monopolize trade in the industry. The last allegation appears to rest primarily on conjecture; the evidence offered in support of the allegation is rather tenuous and is clearly insufficient to support it.

The defendant has been in business many years, and during its existence has acquired and accumulated many patents, all of which, except twenty, have expired. It appears from the undisputed evidence that all but three of the unexpired patents resulted from research and development by the defendant's employees; the other three were acquired by purchase. The subject matter of these patents, except those received in evidence in the patent phase of this litigation, is not revealed by the evidence. It cannot be inferred, in the absence of evidence sufficient to support the inference, that all of these patents cover the individual movable eye, the commodity with which we are here concerned.

■ The mere accumulation of these patents by the defendant, no matter how many, may not be condemned as illegal under the antitrust laws in the absence of some evidence that they were misused to unlawfully extend the patent monopoly. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S. Ct. 894, 94 L.Ed. 1312; Cole v. Hughes Tool Company, 10 Cir., 215 F.2d 924, 933, 934, certiorari denied, 348 U.S. 927, 75 S.Ct. 339, 99 L.Ed. 726. The principle is particularly applicable where, as here, most of the unexpired patents cover inventions conceived and developed by the employees of the defendant under an established research program. There is no evidence in this case that the defendant misused the patents to unlawfully extend its monopoly unless the suits for infringement, hereinafter discussed, may be so regarded. We are of the opinion that they cannot be so regarded.

The defendant, prior to the commencement of the present litigation, instituted nine suits for patent infringement; of this number, six were instituted between 1954 and 1956, inclusive. These suits resulted in judgments favorable to the defendant, two after trials of the actions on the merits, and three on consent. There are three suits still pending; another pending suit was settled on terms not disclosed to the Court. It should be noted that in one of the cases in which the defendant prevailed in the trial of the action on the merits, the decision of the District Court was reversed. This record would hardly support the inference that the litigation in which the defendant engaged was sham, and there is no evidence that it was.[1]

■ The patents owned by the defendant are presumed to be valid, and the defendant had a right under the patent laws to protect them against infringement. The institution of the suits for patent infringement may not be condemned as a violation of the antitrust laws in the absence of persuasive evidence that the suits were sham and brought for the purpose of stifling competition. Cole v. Hughes Tool Company, supra, 215 F.2d 934, et seq.; Ronson Patents Corp. v. Sparklets Devices, Inc., D. C., 112 F.Supp. 676. There is no such evidence in this case. An inference of illegality may not be drawn from the mere fact that suits for patent infringement were prosecuted.

The right of a patent owner to maintain appropriate suits for infringement without being adjudged guilty of a misuse of the patents is established by the patent laws. 35 U.S.C.A. § 271(d). It is therein provided: "No patent owner

---

1. We have omitted the case of Markon v. Grubman, instituted in 1928. This litigation seems rather remote.

otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: * * * (3) sought to enforce his patent rights against infringement or contributory infringement."

The plaintiff relies on the case of Kobe, Inc., v. Dempsey Pump Co., 10 Cir., 198 F.2d 416, certiorari denied 344 U.S. 837, 73 S.Ct. 46, 97 L.Ed. 651. The cited case is clearly distinguishable from the present one. There the Court concluded that there was ample evidence that the defendant's acquisition of the important patents in the field was coupled with a design to eliminate actual and potential competitors. The rather meager evidence in this case will not support a similar conclusion.

The case of Margon Corporation v. Samco Products Corporation was terminated in 1947, on the entry of a consent judgment. The parties at that time entered into an agreement, under the terms of which one of the defendants, Samco Products Corporation, admitted that the patents in suit were valid and infringed and agreed to discontinue the infringements; this defendant further agreed to sell and deliver to the Margon Corporation its full inventory of dolls' eyes, raw material, etc. Another defendant, Rose Mechanical Laboratories, a partnership, agreed to sell and deliver to the Margon Corporation all tools, dies, and equipment used in the manufacture of the infringements. The full consideration paid by the Margon Corporation was $95,000.00. It seems reasonable to assume that this represented the reasonable value of that which was sold. This assumption is predicated on paragraph 5 of the agreement, which provides for the allocation of the purchase price.

The said contract contained this specific provision: "The parties of the second part and each of them, covenant and undertake to discontinue their manufacture and sale of any and all doll eyes or any tools, dies and jigs employed in the manufacture thereof, and they and each of them, further covenant, agree and undertake that they will not directly or indirectly resume or be engaged in any business relating to the manufacture or sale of doll eyes, anywhere in the United States of America in the territory thereof east of the Mississippi River, for and during the term of five years from the effective date of this agreement." What effect, if any, this provision may have had on the competitive market at the time does not appear from the evidence; this fact becomes relatively unimportant. The contract expired in December of 1952, and it is difficult to perceive how it could have affected the competitive market during the critical period. The parties to the agreement have been at liberty to re-enter the field as a competitor since the contract expired.[2]

The case of Margon Corporation v. Winslow Metal Mfg. Corp. et al., was terminated in 1952, on the entry of a consent judgment. The parties at that time entered into a series of agreements, under the terms of which the Winslow Metal Mfg. Corp. and those affiliated with it, sold and delivered to Margon equipment, inventory, and two pending patent applications, for a total consideration of $125,000. There was no provision in these agreements which precluded the Winslow Metal Mfg. Corp., from resuming the manufacture of dolls' eyes; in

2. It appears from the testimony of Herman Bloom, Vice President of the Margon Corporation, that prior to 1948, the defendant sold approximately 80% of the dolls' eyes. It further appears from his testimony that subsequent to 1948, the defendant sold approximately 50% of the individual movable eyes. This witness claimed that the individual movable eye was developed by his company. Whether the defendant's dominance in the field was due to this or some other factor, the evidence does not disclose. He further testified that the competitors did not appear in the market until about 1952 or 1953. A determination that the position of dominance was attained illegally would be based upon conjecture.

fact, it appears that the said corporation re-entered the field. It further appears that in 1956 it was adjudged guilty of patent infringement in a suit brought by the Margon Corporation.

The case of Margon Corporation v. Composition Novelty Co., was terminated in 1956, on the entry of a consent judgment. It appears from the testimony that under the terms of the settlement the defendant in that litigation paid to the Margon Corporation the sum of $6,-000, in lieu of damages, and surrendered certain tools and equipment. It was agreed between the parties, however, that the tools and equipment would be returned to the Composition Novelty Co., upon expiration of the patents in suit. There was clearly nothing unusual about the agreement of settlement, since the defendant in that case apparently admitted validity and infringement.

█ The only other complaint of the plaintiff is that the defendant reduced its prices on competitive articles of manufacture. This conduct was not in and of itself illegal. The very right to compete in a free market presupposes a right to lower prices in good faith to meet the prices of one's competitors on comparable articles of manufacture. There is no evidence in this case that the price reductions were not effected in good faith and for the purpose of meeting competition; there is no evidence, for example, that the prices were either below cost or unreasonable in the light of competitive conditions. It should be noted that the absence of evidence concerning price policies is due solely to the reluctance of both the plaintiff and defendant to furnish it. (See page 728 of the record.)

The statement of the Court in Ben Hur Coal Co. v. Wells, 10 Cir., 242 F.2d 481, at page 486, certiorari denied 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1427, is apposite. It was therein stated: "We cannot say, however, that a pricing policy based upon sound economics is inadmissible simply because it may result in the destruction of a competitor, for it is not within the scope or purpose of the antitrust laws to protect the business against loss in a competitive market. (Citation omitted.) One who reduces his prices in defense of his economic life cannot be guilty of eliminating competition or his competitors." Whether or not the price policies of the plaintiff and the defendant were based upon sound economics we cannot decide, and this because of the reluctance of the litigants to produce the evidence upon which such a decision could be made.

The plaintiff relies on the case of Moore v. Mead's Fine Bread Co., 348 U. S. 115, 75 S.Ct. 148, 99 L.Ed. 145. The cited case is distinguishable from the present one. There the evidence was sufficient to support a factual determination that the defendant had launched a price war and had willfully engaged in price discrimination for the purpose of eliminating a competitor. The evidence in this case will not support such a determination.

█ The defendant undoubtedly attained a position of dominance in the field, but the evidence will not support a determination that this position was attained illegally. "The law, however, does not make the mere size of the corporation, however impressive, or the existence of unexerted power on its part, an offense, when unaccompanied by unlawful conduct in the exercise of its power." United States v. International Harvester Company, 274 U.S. 693, 708, 47 S.Ct. 748, 753, 71 L.Ed. 1302; see also United States v. United States Steel Corporation, 251 U.S. 417, 451, 40 S.Ct. 293, 64 L.Ed. 343. The only power which the defendant appears to have exercised was in the institution of suits for patent infringement, and this it had a right to do, as we have heretofore held, to protect a lawful monopoly granted under the patent laws.

█ █ However, even if we assume that the defendant was guilty of monopolistic practices, the claim for damages under Section 4 of the Clayton Act, su-

pra, must fail because of the failure of the plaintiff to prove a cause of action thereunder. The pertinent provision of the Act affords a remedy to any "person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." The burden was therefore upon the plaintiff to prove an injury to either his business or property of which the conduct of the defendant was the proximate cause. Hunter Douglas Corporation v. Lando Products, Inc., 9 Cir., 235 F.2d 631, 637; Wolfe v. National Lead Company, 9 Cir., 225 F.2d 427, 433, certiorari denied 350 U.S. 915, 76 S.Ct. 198, 100 L.Ed. 802; Turner Glass Corporation v. Hartford-Empire Co., 7 Cir., 173 F.2d 49, 51, 52, certiorari denied 338 U.S. 830, 70 S.Ct. 57, 94 L. Ed. 505; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236, 238, 239. The plaintiff failed to sustain this burden; the record is completely devoid of any evidence which would sustain a determination that the plaintiff was injured in its business or property.

■■■■ The claim for injunctive relief under Section 16 of the Clayton Act, supra, must likewise fail, and for the same reason. An action under this section of the Act is governed by the established principles of equity. The plaintiff would be entitled to relief only upon proof of "threatened loss or damage". There is no such proof in this case. The statute does not vest in a private litigant the right to redress a public wrong; this right is reserved to the several district attorneys of the United States, who act under the direction of the Attorney General.

The statement of the Supreme Court in the case of United States v. Borden Company, 347 U.S. 514, at page 518, 74 S.Ct. 703, at page 706, 98 L.Ed. 903, is apposite. It is therein stated: "Section 15 of the Clayton Act, 15 U.S.C. § 25, 15 U.S.C.A. § 25, charges the United States district attorneys under supervision of the Attorney General, with the duty of instituting equity proceedings to prevent and restrain violations of certain of the antitrust laws, including price discrimination. Under § 16 of the Act, 15 U.S.C. § 26, 15 U.S.C.A. § 26, a private plaintiff may obtain injunctive relief against such violations only on a showing of 'threatened loss or damage'; and this must be of a sort personal to the plaintiff."

■■■ The claim for injunctive relief must fail because of a further reason. The plaintiff prays generally that the alleged monopolistic practices of the defendant be perpetually enjoined, but prays specifically that the defendant be enjoined from maintaining "any other action [on] * * * Letters Patent No. 2,657,500, or any other Letters Patent, or * * * alleged trade secrets * * *." This relief, insofar as it relates to the patent and trade secrets in issue in the patent phase of this litigation, assuming that the plaintiff would have been entitled to such relief, is unnecessary. The threat of loss or damage, if any, ascribable to prospective suits, has been removed by the decision of this Court. There is no evidence that the plaintiff is threatened by any other litigation except, of course the patent infringement suit now pending in the United States District Court for the Eastern District of New York. We see no reason to interfere with this litigation.

The plaintiff further prays that the defendant be enjoined from the prosecution of the counterclaims filed in this litigation. This relief is likewise unnecessary because the issues have been decided on the merits.

The claim for relief asserted by the plaintiff under Section 3 of the Robinson-Patman Act, supra, must be dismissed because the plaintiff has no cause of action thereunder. Nashville Milk Co. v. Carnation Company, 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed. 340. It might be observed further that there is no evidence that the defendant was guilty of any practices condemned by the Act.

**66**

Conclusions

**I.**

The Court has jurisdiction of the parties and of the subject matter.

**II.**

A judgment in favor of the defendant and against the plaintiff, consistent with the opinion of the Court, may be entered on the claim for infringement asserted by the plaintiff in the original complaint.

**III.**

A judgment in favor of the plaintiff and against the defendant, consistent with the opinion of the Court, may be entered on the claim for infringement asserted by the defendant in its counterclaim.

**IV.**

A judgment in favor of the plaintiff and against the defendant, consistent with the opinion of the Court, may be entered on the claim for appropriation of trade secrets asserted by the defendant in its counterclaim.

**V.**

A judgment in favor of the plaintiff and against the defendant, consistent with the opinion of the Court, may be entered on the claim for unfair competition asserted by the defendant in its counterclaim.

**VI.**

A judgment in favor of the defendant and against the plaintiff, consistent with the opinion of the Court, may be entered on the claim of the plaintiff under the antitrust laws.

**VII.**

The entry of judgment shall be without costs.

NOTE: The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.